*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

REGINALD JELLS,

*Petitioner-Appellant,*

*v.*

No. 02-3505

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-02453—John M. Manos, District Judge.

Argued: March 19, 2008

Decided and Filed: August 18, 2008

Before: BATCHELDER, COLE, and CLAY, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Alan C. Rossman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Alan C. Rossman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, William T. Doyle, LAW OFFICES, Cleveland, Ohio, for Appellant. Lisa Marie Stickan, Daniel R. Ranke, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

COLE, J., delivered the opinion of the court, in which CLAY, J., joined. BATCHELDER, J. (pp. 28-37), delivered a separate dissenting opinion.

_____

### OPINION

_____

COLE, Circuit Judge. A Cuyahoga County, Ohio three-judge panel convicted Reginald Jells for the murder of Ruby Stapleton and sentenced him to death on October 6, 1987. After exhausting direct and post-conviction remedies in the State of Ohio, Jells timely filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio on October 27, 1998. The district court denied his petition on March 18, 2002. For the reasons below, we **REVERSE** the judgment of the district court.

# I. BACKGROUND

## A. Facts

Under 28 U.S.C. § 2254(e)(1), Jells has "the burden of rebutting the presumption of correctness [accorded to a state court's finding of facts] by clear and convincing evidence." Jells has failed to rebut this presumption, and we therefore adopt the facts, but not the legal conclusions, as detailed by the Supreme Court of Ohio:

> On April 18, 1987, at about 10:30 to 11:00 p.m., the victim Ruby Stapleton and her four-year-old son Devon Stapleton were kidnapped in front of several witnesses at the intersection of Lakeview and Euclid Avenues in Cleveland. Three witnesses to the kidnapping and Devon identified appellant Reginald Jells as the kidnapper. Also, the witnesses identified the victim as the woman the appellant picked up and threw into a van. Moreover, the witnesses identified the van used by the appellant during the kidnapping.

> Owen Banks, a witness to the abduction, testified that while he was a passenger in a car driven by his daughter, Camila Banks, he heard a woman's screams and saw the victim and appellant "tussling." He also noted that the van used to abduct the victim and her child had a sign which read "Keep on Trucking," although the van which was linked to the appellant was found to display a sign which read "Keep on Vannin." During the abduction, Owen jumped out of the car and told his daughter to write down the license plate number of the van because he "sensed something was wrong." Furthermore, Owen observed appellant pick up a little boy, later identified as Devon, and put him into the van.

> Owen approached appellant, who told him that the victim was drunk. Owen stated that he had a good look at appellant, since Owen was at the driver's side of the van looking straight at him. At trial, Owen identified a photograph of the victim as the person who was struggling with appellant, and identified appellant as the perpetrator.

> Camila Banks, another witness to the abduction, testified that she was driving her father home when she heard a woman screaming "help me." She observed the appellant as he dragged a woman, whom she later identified as the victim, to the van and "shoved her inside." Next, she saw appellant pick up a little boy (Devon) and put him inside the van. Camila testified that the woman was trying to fight off the man.

> Camila recorded the license number of the van, "149 MJV." Although the license number was listed in the name of "Reginald Gills," appellant later acknowledged ownership of the van. At trial Camila identified the van from a photograph, and she identified the appellant as the kidnapper.

> Edward Wright, a third witness to the abduction, testified that at about 11:00 p.m., as he was concluding his shift as a security guard at Hough Bakery, he heard a woman scream. He walked to where he heard the screaming and observed a man with his arm around the waist of the screaming woman. He then saw the man throw the woman and the child into the van. Wright gave the Cleveland police a partial license number, "Y 169 or 165." He was able to pick the appellant out of a lineup, and identify him at trial. Further, he identified Devon Stapleton and a photo of the victim.

The testimony of Devon Stapleton, the son of the victim, indicates that he and his mother had entered appellant's van and later they exited the van. It is not clear from his testimony exactly how they initially came to be in the van or how they later came to be out of the van at Lakeview and Euclid Avenues. He further testified that appellant put Devon's mother back into the van, and that while they were in the van appellant hit the victim on the right side of her face with a circular object, causing her to bleed. Devon also stated that his mother was knocked out by the blows. As a result of the attack upon his mother, the hood and sleeve of Devon's coat were wet with blood.

Devon explained that appellant took his mother to a junkyard. There appellant removed his mother's body from the van, carried her into the junkyard, and abandoned her. Then appellant drove to a gas station, purchased gas, and dropped off Devon at another junkyard. Later, Clyde Smith found Devon at this junkyard crying for his mother, so he picked him up and took him to his house and called the police.

On April 26, 1987, appellant was arrested by Cleveland police. The van was identified by the license plate number that was given to police by Camila Banks. An examination of the van revealed appellant's fingerprints. A transmission jack found in the van matched marks found on the victim's body. A tennis shoe print was found on the inside of the van's windshield. The shoe print was compared with the victim's left tennis shoe and was believed to have been made by the shoe.

On April 28, 1987, an off-duty Cleveland police officer found the victim's body partially concealed by a barrel in a junkyard at East 84th and Grand Avenue in Cleveland. The body was partially nude with the pants and panties pulled down and the blouse in disarray.

A piece of cardboard with a muddy shoe print was found near the body. The shoe print matched appellant's right shoe.

The coroner testified that the victim died as a result of multiple blunt impacts to the head, neck, trunk and extremities with multiple injuries to the brain and other internal organs. Altogether the victim suffered over ninety separate blows to her body.

*State v. Jells*, 559 N.E.2d 464, 466-67 (Ohio 1990).

## B. Procedural History

On August 31, 1987, a three-judge panel of the Cuyahoga County, Ohio Court of Common Pleas convicted Jells on two counts of kidnapping, in violation of Ohio Rev. Code § 2904.01, and one count of aggravated felony murder with a kidnapping specification, in violation of Ohio Rev. Code § 2903.01(B). On September 18, 1987, the same panel sentenced Jells to five to twenty-five years imprisonment on each of the kidnapping charges and death on the aggravated felony murder charge. *State v. Jells*, No. CR-217570 (Ohio Ct of Common Pleas, Oct. 6, 1987). On direct review, the Ohio Court of Appeals affirmed Jells's convictions and sentence, *State v. Jells*, No. 54733, 1989 WL 43401 (Ohio Ct. App. Apr. 20, 1989), as did the Ohio Supreme Court, *State v. Jells*, 559 N.E.2d 464 (Ohio 1990).

Jells filed his initial petition for post-conviction relief in the state trial court in November 1991 and an amended petition in April 1995. The trial court reviewed and denied Jells's amended petition, and the Ohio Court of Appeals affirmed. *State v. Jells*, No. 72484, 1998 WL 213175 (Ohio

Ct. App. Apr. 30, 1998).  Jells filed a motion in support of jurisdiction for review by the Ohio Supreme Court on June 29, 1998.  The Ohio Supreme Court declined to exercise jurisdiction and dismissed the case on September 23, 1998.  *State v. Jells*, 699 N.E.2d 946 (Ohio 1998).  On March 11, 1999, Jells filed an application to reopen his direct appeal in the Ohio Court of Appeals.  That court denied his application, *State v. Jells*, No. 54733, 2000 WL 545963 (Ohio Ct. App. Apr. 26, 2000), and the Ohio Supreme Court affirmed, *State v. Jells*, 739 N.E.2d 345 (Ohio 2000).

On September 21, 1999, Jells filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Northern District of Ohio, alleging twenty-three grounds for relief.  On March 18, 2002, the district court concluded that Jells's claims were without merit and dismissed his habeas petition.  The district court issued Jells a certificate of appealability ("COA") on whether trial counsel rendered constitutionally ineffective assistance at sentencing.  On appeal, this Court, on October 3, 2006, granted Jells a COA on the following additional issues: (1) whether the prosecution withheld material, exculpatory information from Jells in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) whether trial counsel rendered ineffective assistance of counsel by encouraging Jells to waive his right to a jury trial without properly informing him of the consequences of the waiver; (3) whether the trial court adequately informed Jells of the consequences of his jury trial waiver so that the waiver was knowing and voluntary; and (4) whether a line-up shown to a prosecution witness was unduly suggestive and rendered the witness's in-court identification unreliable.

## II. STANDARD OF REVIEW

Because Jells filed his federal habeas corpus petition after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, became effective, the standard of review set forth in AEDPA applies to his petition:

> AEDPA prohibits a federal court from granting a writ of habeas corpus to a person in custody pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court unless the adjudication of that claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Morales v. Mitchell*, 507 F.3d 916, 928 (6th Cir. 2007) (quoting *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir.) (quoting AEDPA, 28 U.S.C. § 2254 (d)), *cert. denied*, 537 U.S. 1082 (2002)).

With respect to the first of these bases for habeas relief, the Supreme Court has clarified that the phrase "clearly established" federal law refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Williams v. Taylor* ("*Williams*"), 529 U.S. 362, 412 (2000).  A decision is "contrary to" clearly established federal law as determined by the Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Id.* at 412-13.

As to 28 U.S.C. § 2254(d)(2), a decision involves an "unreasonable application" of clearly established Supreme Court law if a "state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 407, or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Seymour v. Walker*, 224 F.3d 542, 549

(6th Cir. 2000) (citing *Williams*, 529 U.S. at 407). That is, the federal habeas court "should ask whether the state court's application of clearly established federal law was *objectively* unreasonable." *Williams*, 529 U.S. at 409 (emphasis added).

"The Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002). Likewise, the statute's plain language "restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. However, this Court "may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court." *Foley v. Parker*, 488 F.3d 377, 382 (6th Cir. 2007).

This Court applies AEDPA deference to the state courts' determinations regarding the merits of a claim, but we review *de novo* all issues not reached by the state courts. *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006).

## III. PROCEDURAL MATTERS

A petitioner seeking a writ of habeas corpus "must meet certain procedural requirements to permit review of his habeas claims by a federal court." *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "The petitioner must first exhaust the remedies available in state court by fairly presenting his federal claims to the state courts; unexhausted claims will not be reviewed by the federal court." *Id.* (citing *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004); *Lott v. Coyle*, 261 F.3d 594, 601 (6th Cir. 2001)). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Lott*, 261 F.3d at 608 (quotations and citations omitted). If a state court did not entertain a claim, a federal court will not review it where the state court's omission is due either to the petitioner's failure to raise those claims in the state courts while state remedies were available or to the petitioner's failure to comply with a state procedural rule that prevented the state courts from reaching the merits of the claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

In addition, this Court "may not consider a claim for habeas corpus relief if the claim was procedurally defaulted in state court - *i.e.*, if the last state court to render a judgment in the case rejected the claim because it was not presented in accordance with the state's procedural rules." *Girts v. Yanni*, 501 F.3d 743, 753 (6th Cir. 2007) (quoting *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004)). However, noncompliance with a state procedure will bar habeas review only if the state procedure satisfies the standards set forth in *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986). First, there must be a state procedure in place that the petitioner failed to follow. *Maupin*, 785 F.3d at 138. Second, the state court must have denied consideration of the petitioner's claim on the ground of the state procedural default. *Id.* Third, to preclude habeas review, the state procedural rule must be an "adequate and independent state ground," *id.*, that is "firmly established and regularly followed." *Deitz*, 391 F.3d at 808 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). A state procedural rule is an independent ground when it does not rely on federal law. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Further, this inquiry "generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims." *Maupin*, 785 F.3d at 138.

If these three factors are satisfied, a petitioner can overcome the procedural default by either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "Cause" for default requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's

procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Ineffective assistance of counsel can constitute cause, so long as the ineffective assistance of counsel claim is not itself procedurally defaulted. *Id.* at 489. "Prejudice" requires a showing that the errors at trial "worked to [petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Additionally, under the miscarriage-of-justice exception, the Court may consider an otherwise defaulted claim if it concludes that the petitioner has shown that the "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray*, 477 U.S. at 496).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

### A. The Ohio Court of Appeals Decision

The Ohio Court of Appeals rejected Jells's claim that counsel were ineffective in preparing for the sentencing phase of his trial:

> Petitioner next asserts that his trial counsel were ineffective in failing to introduce evidence regarding his troubled family and early life and in failing to utilize expert assistance.
>
> As an initial matter, we "must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation." *State v. Frazier* (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. *Laugensen v. State*, supra; *State v. Lott*, supra. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.
>
> In this matter, the mitigation presented at trial tended to focus upon petitioner's loving behavior to his family, his good behavior at school, his obedience to authority and his teachers, his strong work ethic, and his tendency to walk away from an argument. In addition, trial counsel indicated that petitioner's family had moved many times, and also presented expert opinion evidence that petitioner was of borderline intelligence and over-controlled his hostility. Finally, petitioner presented an unsworn statement in which he emphasized his work ethic, his empathy for Devon, his sadness at the tragic manner in which Stapleton must have met her death, and his disagreement with the verdict reached by the panel. Further, in its written opinion, the three judge panel observed that petitioner had presented evidence of, *inter alia,* character, family relationships, employment history, and emotional stability.
>
> Examining the evidence now offered de hors the record, we find that a certain measure of the evidence which petitioner now claims should have been admitted to be cumulative of what was presented at trial, i.e., the frequent moves, change of caregivers, borderline intelligence, superficial personality style. We are therefore unable to conclude that there is a reasonable probability that, but for this alleged omission of counsel, the result of his trial would have been different, and petitioner's challenge to the effectiveness of counsel in this respect fails. See *Sowell*, supra, at 681, 598 N.E.2d 136.

As to the remaining items concerning the other more tragic circumstances which petitioner now claims should have been admitted, i.e., his mother's alcoholism and the abuse which he often witnessed, this information would appear to be completely inconsistent with the favorable portrait of petitioner which counsel presented at trial. That is, trial counsel emphasized the favorable aspects of petitioner's life and chose to present him as someone who over controlled his negative feelings and had "no pathological difference" or "condition requiring treatment or \*\*\* thought disorder." (Tr. 584) Considered in light of the nature of petitioner's defense at trial, we are compelled to conclude that the more negative information produced in connection with the amended petition for post-conviction relief is inconsistent with the essential trial strategy of working to establish reasonable doubt and in turn residual doubt that petitioner committed these offenses. We are therefore unable to conclude that counsel was ineffective in failing to present this information. Accord *State v. Combs* (1994), 100 Ohio App.3d 90, 103, 652 N.E.2d 205 wherein the court stated:

> A post conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial. *State v. Jamison* (Nov. 10, 1992), Hamilton App. No. C-910736, 1992 WL 333011. The affidavits of Keefe and Smith presented mitigation theories that were no more than alternative or cumulative to the theories used by Fisher. Therefore, they do not support substantive relief under either prong of the *Strickland-Lockhart-Bradley* test.

> Accord *State v. Lott*, supra; *State v. Williams* (1991), 74 Ohio App.3d 686, 695, 600 N.E.2d 298 (rejecting the argument that trial counsel was ineffective by failing to put forth mitigation evidence on that defendant's troubled childhood). Indeed, social worker Linda Pudvan's averment that even negative family history is relevant to provide an "explanation of Mr. Jells life and behavior during his offense" and attorney Ken Murray's averment that unfavorable information "further serves to explain the stresses and traumatic events that culminated the night of the offense" seem odd in light of the complete denial presented at trial.

*Jells*, 1998 WL 213175, at \*5-6. Because the Ohio Court of Appeals found that counsel's performance was not deficient, it did not reach the prejudice prong of the *Strickland* analysis.[1]

---

[1]The dissent claims that the Ohio Court of Appeals found Jells's counsel's performance to be deficient but not prejudicial, Dissenting Op. at 36, but quotes selectively from the Ohio Court of Appeals' decision when reaching this conclusion. Above, we include the entirety of the Ohio court's decision on this issue. Read in context, the dissent's assertion that the Ohio court "largely accepted Jells' assertion that his counsel's investigation was deficient and decided the case instead on the question of prejudice," *see* Dissenting Op. at 36, is clearly erroneous, as time and again in this section the Ohio Court of Appeals focuses on the standard for deficiency, not the standard for prejudice. In fact, its only explicit mention of the prejudice prong from *Strickland* is a quotation from another case, which the Ohio Court of Appeals cites as support for the deficiency prong and not the prejudice prong. *Jells*, 1998 WL 213175, \*6. The complete excerpt from the Ohio opinion demonstrates that the court was determining whether Jells's counsel's performance was deficient, not whether Jells was prejudiced. *See, e.g., id.* at \* 5 (stating that the court was "unable to conclude that counsel was ineffective in failing to present this information"); *id.* at \*6 (stating that "[a] post conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial"); *id.* (citing *State v. Williams*, 600 N.E. 2d 298 (Ohio Ct. App. 1991) for the proposition that "trial counsel was [not] ineffective by failing to put forth mitigation evidence on that defendant's troubled childhood"). In contrast to the repeated references to counsel's *performance* in this section, there is only one comment in this section that might be interpreted as a reference to the *prejudice* prong: "but for this alleged omission of counsel, the result of his trial would have been different." *Id.* \*5. Even here, the remainder of the sentence makes it clear that the court is, yet again, reaching the issue of ineffectiveness and not prejudice: "Jells's challenge to the effectiveness of his counsel in this respect fails."

## B. The Legal Standard

Jells claims that his counsel was ineffective during sentencing because counsel failed to investigate relevant evidence that could have been presented. We engage in a two-part inquiry when reviewing ineffective-assistance-of-counsel claims:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The *Strickland* standard applies to Jells's claim:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. We do not decide "whether counsel should have presented a mitigation case," but rather "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Jells's] background was *itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (emphasis in original).[2] A *Strickland* violation is established where the scope of an attorney's investigation into mitigating evidence prior to trial was "unreasonable in light of what" counsel knew about their client. *Id.* at 525.

## C. Analysis

The Ohio Court of Appeals correctly identified the *Strickland* standard as the governing federal rule. *State v. Jells*, No. 72484, 1998 WL 213175, at *2 (Ohio Ct. App. Apr. 30, 1998); *see also Williams*, 529 U.S. at 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'") (quoting 28 U.S.C. § 2254(d)(1)); *Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (clarifying that *Strickland* is the rule that courts must apply to claims challenging the effectiveness of trial counsel during a capital sentencing hearing). However, we conclude that the Ohio court applied this standard to the facts of Jells's case in an objectively unreasonable manner.

---

[2]Subsequent Supreme Court decisions in *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins*, 539 U.S. 510, and *Williams*, 529 U.S. 362, merely explained the standard set out in *Strickland* and do not establish new law. Therefore, we may rely on those decisions when analyzing Jells's ineffective assistance of counsel claim even though those cases were decided after his convictions became final. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

1. *Deficient Performance*

In addition to the general *Strickland* standard regarding deficient performance, the Supreme Court has provided specific guidance with respect to reasonable professional assistance during the sentencing phase of a capital case. *See Rompilla,* 545 U.S. at 381-90; *Wiggins*, 539 U.S. at 521-29; *Williams*, 529 U.S. at 395-97. In particular, the Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396 (citing ABA Standard for Criminal Justice 4-4.1 (2d ed. 1980)); *see also Anderson*, 460 F.3d at 802 ("Defense counsel's complete failure to investigate before deciding not to present mitigating evidence is deficient performance as a matter of law under *Strickland*."); *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) ("Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'") (quoting *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001)). Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)); *accord Hamblin*, 354 F.3d at 486 (finding *Wiggins* to "stand[] for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases").

This constitutionally required background investigation is necessary to enable counsel to make strategic choices about presenting a mitigation defense. *See Williams*, 529 U.S. at 397. Indeed, the deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments. *See Wiggins*, 539 U.S. at 521. Accordingly, when evaluating the reasonableness of counsel's mitigation strategy in a capital case, "a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id*. "[A]ny decision to forego mitigation evidence is unreasonable if not made after a reasonable determination to cease further investigation." *Spisak v. Mitchell*, 465 F.3d 684, 704 (6th Cir. 2006).

In the instant case, Jells claims that his trial counsel were ineffective by: (1) failing to prepare for the mitigation phase of the case until after he was convicted; (2) failing to utilize a mitigation specialist to gather information about his background, including his educational, medical, psychological, and social history; (3) failing to request a continuance so that a proper mitigation defense could be prepared; and (4) failing to develop a mitigation strategy. For the reasons below, we conclude that the state courts' failure to grant relief on the first two grounds was an unreasonable application of *Strickland*.

(a) *Failure to Timely Prepare*

Dr. James Eisenberg, Jells's mitigation phase expert, testified at the habeas evidentiary hearing that he was not contacted by Jells's trial counsel until September 2, 1987, two days after Jells had been convicted and only sixteen days prior to the mitigation hearing. Prior to that, counsel had failed to employ a mitigation specialist or expert who would have gathered evidence of Jells's personal history and any available records. When Jells's trial counsel contacted Dr. Eisenberg, they asked him to perform a psychological evaluation of Jells, but failed to provide him with Jells's personal history records—records that would have been collected had they used a mitigation specialist—that were necessary for the evaluation. Without the history and records, Dr. Eisenberg was unable to perform the requested psychological evaluation. Thus, his testimony at the mitigation

hearing was not supported by a complete evaluation of Jells, but was supported by the limited psychological test he had time to administer.

In addition, Jells's counsel "failed to conduct an investigation that would have uncovered extensive records" describing Jells's difficult youth. *Williams*, 529 U.S. at 395. Jells's counsel interviewed only three family members, neglecting to speak with many other family members who had lived with Jells and were available. When speaking with the family members they did contact, their inquiry was brief and they failed to ask sufficiently probing questions; as a result they failed to discover the abuse that Jells received from his mother's live-in boyfriend and his stepfather. Jells counsel did not obtain a psychological report prior to trial, and failed to obtain accessible school records—reports and records that would demonstrate that Jells had mental impairments, including learning difficulties that led to disruptions in the classroom and an extremely low reading level. Further, even if counsel could have claimed ignorance of Jells's difficulties as a result of their abdication of responsibility to inquire into Jells's background, information that would have "prodded" them into action was readily available to them in the Competency Report. This Competency Report provided the same sort of "prodding" information as the Department of Social Services records or the Presentence Investigation Report described in *Wiggins*, and, given such information, any "reasonably competent" attorney would have expanded the search for mitigating evidence beyond the three witnesses and would have questioned Jells and the three witnesses in further detail. *See Wiggins*, 539 U.S. 524.

The failure of Jells's trial counsel to begin mitigation preparations prior to the end of the culpability phase of Jells's trial was objectively unreasonable under *Strickland*. *See Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (concluding that counsel's "fail[ure] to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase . . . was objectively unreasonable"); *see also Williams*, 529 U.S. at 395 (finding it significant that "counsel did not begin to prepare for [the mitigation] phase of the proceeding until a week before the trial"); *Hamblin*, 354 F.3d at 487 n.2 (noting that, under the professional norms established by the ABA, a "mitigation investigation should begin as quickly as possible"); *Greer v. Mitchell*, 264 F.3d 663, 676-678 (6th Cir. 2000) ("Under circumstances where a finding of guilty cannot come as a surprise, failure to anticipate such a finding so as to adequately prepare for the sentencing phase is constitutionally impermissible."). Accordingly, the Ohio Court of Appeals unreasonably applied *Strickland* when it neglected to find that Jells's trial counsel's failure prepare for the mitigation hearing in a timely fashion constituted deficient performance.

(b) *Failure to Use a Mitigation Specialist*

We also conclude that Jells's counsel were ineffective in failing to use a mitigation specialist who would have gathered information about Jells's educational, medical, psychological, and social background necessary to prepare a proper mitigation defense. In a post-conviction affidavit, Dr. Susan Shorr, a mitigation specialist for the Cuyahoga County Public Defender's Office, stated that Jells's trial counsel initially requested her assistance but "never followed through on their request by formally involving [her] in the case." Had her assistance—which she was willing to give—been obtained, she would have gathered evidence pertaining to Jells's "developmental experiences," "family dynamics and functioning," "academic capacities and concomitant academic success or failure," "interpersonal relationships and social adjustments," "history of drug and alcohol abuse," and general "psychological functioning."

Similarly, Dr. Eisenberg testified that Jells's trial counsel did not appear to have consulted with any mitigation specialist or to have gathered the evidence that such a specialist would typically collect. In fact, Dr. Eisenberg testified that he could not recall ever having been involved in a mitigation case where he was provided absolutely no school records, medical records, psychological test results, or any social history to evaluate. Dr. Eisenberg stated that he not only never met with

a mitigation specialist, but that the necessary information that is generally gathered by such a specialist was never presented to him. Jells confirms that no mitigation specialist was used in his case. In his affidavit, Jells states that he was never visited by anyone "who could assist [his] attorneys in preparing for mitigation. There were no mitigation specialists or investigators who visited or talked with [him] concerning [his] case or mitigation." Due to the absence of a mitigation specialist, Jells "was unable to provide [his attorneys] with any background concerning [himself] or to assist in the mitigation phase of [his] trial."

In the context of Jells's case, his counsel's failure to employ a mitigation expert who would have fully investigated Jells's educational, social, and psychological background was objectively unreasonable. In *Williams v. Taylor*, the Supreme Court found counsel ineffective where they failed to interview all available witnesses and failed to present evidence of "mistreatment, abuse, and neglect during [the defendant's] early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." 529 U.S. at 370. The Supreme Court held that defendants have "a right—indeed a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Id.* at 393.

Similarly, in *Wiggins v. Smith*, the defendant was found to have been deprived of competent counsel when his "counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Wiggins*, counsel obtained the Presentence Investigation Report and records kept by the department of social services and procured a psychological investigation prior to trial. The Supreme Court held that "[c]ounsel's decision not to expand their investigation beyond the [Presentence Investigation Report] and the [Department of Social Services] records fell short of the professional standards" that prevailed at that time, which required the preparation of a social history report, and below the standards promulgated by the American Bar Association, "standards to which we have long referred as 'guides to determining what is reasonable.'" *Id.* (citing *Strickland*, at 466 U.S. at 688; *Williams*, 529 U.S. at 396). There, "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered in the [Department of Social Services] records," which revealed evidence of alcoholism and neglect on the part of Wiggins' mother. *Id.* at 525. The Court held that "any reasonably competent attorney would have realized that pursuing these leads was necessary." *Id. See also Rompilla*, 545 U.S. at 382 (holding that counsel had a duty to examine Rompilla's school records and incarceration records and to look for evidence of a history of dependence, as discovered information could have an "extenuating significance").

While Jells's counsel did not have a specific obligation to employ a mitigation specialist, they did have an obligation to fully investigate the possible mitigation evidence available. *See, e.g.*, *Williams*, 529 U.S. at 397. Under Ohio law, the range of potential mitigation evidence is quite broad. To determine whether a sentence of death is appropriate, the Ohio death penalty statute provides that a three-judge panel must weigh against the aggravating factors, "the nature and circumstances of the offense, *the history, character, and background of the offender*" and other relevant factors.[3] Ohio Rev. Code § 2929.04(B) (emphasis added). Ohio law also give defendants

---

[3] These other relevant factors include:

(1)     Whether the victim of the offense induced or facilitated it;
(2)     Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
(3)     Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
(4)     The youth of the offender;

"great latitude in the presentation of evidence of [mitigation] factors." Ohio Rev. Code § 2929.04(C). Thus, to provide professionally competent assistance in Ohio capital cases, defense counsel must conduct a reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's family, social, and psychological background. *See Wiggins*, 539 U.S. at 524 (noting that, according to ABA standards, "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences"); *Carter v. Bell*, 218 F.3d 581, 596-97 (6th Cir. 2000) (concluding that defense counsel's failure to investigate the defendant's "family, social or psychological background . . . constituted representation at a level below an objective standard of reasonableness").

Jells's counsel failed to fulfill their duty to investigate Jells's background prior to the mitigation hearing. That Jells's counsel conducted some investigation of Jells's background is evident from their limited presentation of Jells's unstable childhood and academic difficulties during the mitigation hearing. However, while counsel generally has the discretion to determine that further investigation into available mitigating evidence is unnecessary, *see Strickland*, 466 U.S. at 699-700, counsel's awareness of Jells's unstable home environment and academic difficulties should have alerted them that further investigation by a mitigation specialist might proved fruitful. *See Wiggins*, 539 U.S. at 524-25 (finding counsel ineffective for having "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and critiquing counsel for not pursuing leads discovered during his minimal investigation); *Harries*, 417 F.3d at 638 (critiquing counsel for "declin[ing] to seek the assistance of a mental health expert or conduct a thorough investigation of [petitioner's] mental health, even after [petitioner's] mother alerted them that [petitioner] suffered from mental illness").

(c) *Failure to Request a Continuance*

We find Jells's third argument, that his counsel were ineffective in failing to request a continuance to gather mitigation evidence, to be unpersuasive. Dr. Eisenberg testified that, when initially contacted by Jells's counsel, he informed them that he did not have sufficient time to prepare a psychological evaluation because he needed more time "to collect records, to interview family members, [and] to work with the social worker to prepare a complete and thorough social history of [Jells]." Jells's counsel did not request a continuance from the Ohio trial court.

While the Court should not generally second guess trial strategy decisions such as requests for a continuance, *see Strickland*, 466 U.S. at 698, counsel's choice in this case not to seek more time to prepare adequately for the mitigation phase violated their obligation to "conduct a thorough investigation" of potential mitigating evidence. *Williams*, 529 U.S. at 397. Because Jells's counsel were under an obligation to investigate fully any potential mitigation evidence and were aware that gathering records of Jells's social history would have assisted in presenting a psychological evaluation of Jells during the mitigation hearing, counsel's failure to request more time to gather such evidence was objectively unreasonable. *See Tucker v. Prelesnik*, 181 F.3d 747, 756 (6th Cir. 1999) (finding that counsel was ineffective in failing to request a continuance when "he was

---

(5)     The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6)     If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7)     *Any other factors that are relevant to the issue of whether the offender should be sentenced to death.*

Ohio Rev. Code § 2929.04(B) (emphasis added).

unprepared for trial and had not obtained critical evidence of which he was aware"). Nonetheless, it was not an unreasonable application of *Strickland* for the Ohio Court of Appeals to conclude that counsel's failure to request a continuance did not constitute ineffective assistance. As noted above, this Court has generally afforded counsel great deference with regard to requesting continuances. *See, e.g.*, *Poindexter v. Mitchell*, 454 F.3d 564, 575 (6th Cir. 2006). It was not unreasonable for the Ohio court to afford counsel the same deference in this case.

### (d) *Failure to Employ Any Mitigation Strategy*

Finally, we reject Jells's argument that his counsel erred by failing to develop a mitigation strategy. In support of this contention, Jells points to Dr. Eisenberg's testimony that Jells's counsel never discussed a mitigation strategy with him nor indicated that they even had a strategy. Similarly, Jells states in his own affidavit that he does not recall his attorneys ever "discussing with [him] the purpose of mitigation, what the judges would be looking for as mitigating, or what qualifies for mitigation." However, the fact that trial counsel did not share their mitigation strategy with Jells or with Dr. Eisenberg does not necessarily demonstrate that his trial counsel did not have a mitigation strategy. On the contrary, the Ohio Court of Appeals found that Jells's counsel were operating "with the essential trial strategy of working to establish reasonable doubt and in turn residual doubt that petitioner committed these offenses." *State v. Jells*, No. 72484, 1998 WL 213175, at *5 (Ohio Ct. App. Apr. 30, 1998). Jells contests this finding as an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Yet, Jells fails to offer any evidence, let alone the "clear and convincing evidence" needed, to rebut this factual determination of the Ohio Court of Appeals. 28 U.S.C. § 2254(e)(1). Moreover, even if the Ohio Court of Appeals' characterization of counsel's trial strategy can be viewed as unreasonable, the record clearly demonstrates that defense counsel, at a minimum, employed the "strategy" of presenting Jells as an appropriate candidate for life imprisonment rather than for the death sentence.

This conclusion does not negate our earlier conclusion that the Ohio courts unreasonably applied *Strickland* when they rejected Jells's ineffective assistance of counsel claim, as "defense counsel's decision to focus on residual doubt alone could not constitute a reasonable trial strategy because defense counsel never conducted an investigation into mitigation before deciding to pursue residual doubt." *Anderson*, 460 F.3d at 804. In this case, Jells's counsel failed to conduct an adequate investigation into potential mitigation evidence. This failure to investigate was objectively unreasonable, *see id.*, and counsel's decision to pursue a residual doubt strategy based upon that ineffective investigation was also unreasonable. *See Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

### (e) *Conclusion Regarding Deficiency Prong*

Jells has demonstrated that his counsel provided ineffective assistance when they: (1) failed to timely prepare for the mitigation phase of Jells's trial; and (2) failed to use a mitigation specialist to gather information about Jells's background in preparation for mitigation. The Ohio Court of Appeals' refusal to recognize that these omissions by Jells's counsel fell outside the bounds of professionally competent assistance constituted an unreasonable application of federal law as determined by the Supreme Court in *Strickland*.

2. *Prejudice*

In addition to unreasonably determining that Jells's trial counsel were not ineffective during the mitigation hearing, to the extent that it actually addressed prejudice,[4] the Ohio Court of Appeals unreasonably determined that the alleged errors of Jells's trial counsel did not prejudice Jells's case.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Prejudice exists where the petitioner shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In capital cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating factors did not warrant death." *Id.* at 695. In *Williams*, the Supreme Court instructed that a prejudice determination must be made by "evaluat[ing] the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." 529 U.S. at 397-98. Further, "[m]itigating evidence unrelated to dangerousness may alter the [sentencer's] selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398. Prejudice is established where, taken as a whole, the available mitigating evidence "might well have influenced the [sentencer's] appraisal of [the petitioner's] moral culpability." *Id.* at 398. *See also Wiggins*, 539 U.S. at 536 (concluding that "had the jury been confronted with [the] considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence").

(a) *Evidence Presented at Mitigation Hearing*

In the instant case, the Ohio Court of Appeals reached the following conclusion concerning the evidence introduced at Jells's trial:

> [T]he mitigation presented at trial tended to focus upon petitioner's loving behavior to his family, his good behavior at school, his obedience to authority and his teachers, his strong work ethic, and his tendency to walk away from an argument. In addition, trial counsel indicated that petitioner's family had moved many times, and also presented expert opinion evidence that petitioner was of borderline intelligence and over-controlled his hostility. Finally, petitioner presented an unsworn statement in which he emphasized his work ethic, his empathy for Devon, his sadness at the tragic manner in which Stapleton must have met her death, and his disagreement with the verdict reached by the panel. Further, in its written opinion, the three judge panel observed that petitioner had presented evidence of, *inter alia,* character, family relationships, employment history, and emotional stability.

*Jells*, 1998 WL 213175, at *5.

At the mitigation hearing, Jells's counsel produced four witnesses—(1) Dora Jells Michael, Jells's mother; (2) Barabaray Lee Jones, Jells's uncle; (3) Anna Bee Jells, Jells's maternal grandmother; and (4) Dr. Eisenberg—as well as unsworn testimony from Jells himself. Jells's

---

[4] Referencing the "cumulative" presentation of information, the Ohio Court of Appeals noted that it was "unable to conclude that there is a reasonable probability that, but for this alleged omission of counsel, the result of his trial would have been different, and [Jells's] challenge to the effectiveness of his counsel in this respect fails." *Jells*, 1998 WL 213175, *5. This reference at most addresses how Jells's counsel's failure to present certain pieces of evidence was not deficient—it certainly makes no determination as to whether the failure to present this evidence caused him prejudice. *See Jells*, 1998 WL 213175, *5-6.

mother testified that Jells moved frequently as a child, from Mississippi to New York to Cleveland, and that he was raised by multiple family members. She further stated that Jells was "quiet," "liked to work," and "never gave [her] any problems, except what normal kids would do with parents." Jones testified that he had helped raise Jells. Jones described Jells as a "happy-go-lucky" and non-violent person, and, as far as Jones was aware, someone who did not have any disciplinary problems in school. Jells's grandmother likewise testified that she assisted in raising Jells and was a strong influence in his life. She indicated that Jells did not have any problems at school, worked several jobs, and had an even temperament. Finally, Dr. Eisenberg provided expert testimony concerning the results of various psychological tests that he had administered to Jells. According to Dr. Eisenberg, an intelligence test showed that Jells has an IQ of 77, which "place[d] him in a borderline area of intelligence." Other tests showed that Jells "has trouble in the area of dealing with feelings," "tends to deny unpleasantness and hold things in," has "a need for a strong nurturing figure," and "doesn't have the ability to cope well in unstructured situations." In short, the tests showed that Jells has "a tendency to brush things under the rug . . . minimize some of the unhappy experiences in his life, and . . . prevent emotions such as sadness [from] coming to the surface." Based on these tests, Dr. Eisenberg concluded that Jells did not suffer from any antisocial personality disorder or any other mental illness.

Jells also offered his own unsworn testimony detailing his social and educational background. Jells described that he had moved frequently as a child, and that the moving had frightened him. He explained that he had difficulty with some subjects in school, and that he had been "beaten up" by bullies and occasionally got into fights at school. Jells further indicated that as a teenager he regularly did odd jobs for neighbors until he was sent to a juvenile detention camp for a year for stealing a purse. At the camp, Jells obtained a General Educational Development ("GED") and, following his release, was consistently employed until the time of his arrest. Besides this testimony and that of the four witnesses, Jells offered no other mitigation evidence.

### (b) *Withheld Evidence*

In contrast to the evidence produced during the mitigation hearing, the withheld evidence, which Jells's counsel could have produced at Jells's sentencing hearing if they had conducted an adequate mitigation investigation, paints a significantly more detailed picture of Jells's troubled background.[5]

Jells's school records reveal a history of serious cognitive learning and socialization impairment. These records detail Jells's inability to function academically and his evolving behavioral response—from verbally acting out as the class clown to more openly aggressive tactics—to this frustration. In particular, Jells suffered from a learning disability which led to feelings of inadequacy and insecurity. Jells's below-average intelligence affected his classroom performance. Jells also suffered "serious maladjustment" resulting from his frequent moves. Jells expressed these problems by angrily acting out at school. While school officials recommended that Jells receive counseling on a regular basis and suggested that a referral to a psychiatric clinic should be considered, such actions were never taken. Likewise, the school records reveal several missed opportunities to deal with Jells's cognitive difficulties through special education and remedial classes.

---

[5] Jells has primarily presented this newly available evidence through Dr. Eisenberg's testimony at the habeas evidentiary hearing in the district court. Dr. Eisenberg's testimony reviews the documentary evidence that was uncovered by a search of Jells's educational, medical, and psychological records and provides the psychological analysis of Jells that he was unable to present at the mitigation hearing. Dr. Eisenberg provided an affidavit to the same effect for the Ohio Court of Appeals when it considered Jells's post-conviction relief petition.

Jells's educational troubles were compounded by his family situation. Jells's mother had seven children with different men and she constantly moved in and out of relationships while Jells was living with her. Many of these relationships were abusive and Jells was a witness to the violence and cruelty that were inflicted upon his mother by her partners. The only two men who were somewhat permanent in Jells's childhood home, Henry Delts and Ted Michaels, according to various affidavits, were aggressive and abusive to both Jells and his mother. Jells's mother attested in her affidavit: "Whenever Henry would beat me, [Jells] would usually stand back and watch. [Jells] would then comfort me after the beating." According to the affidavit Jells's aunt submitted, Jells's mother "was very frightened of Henry because of the physical and verbal abuse. Henry had been in the Army and he acted like he had been tortured in a concentration camp. He acted like he was torturing Dora the way he had been tortured. I believe [Jells] saw Henry beating Dora. Henry would also beat [Jells]." Another aunt attested: "I believe that [Jells] witnessed verbal abuse by Ted towards Dora. I believe that [Jells] does not like Ted. . . . [Jells] would rather not see the abuse." Likewise, the abuse inflicted on Jells's mother by Michaels was so upsetting that Jells would occasionally flee from his mother's home to his grandmother's house. Dr. Eisenberg and Dr. Nancy Schmidtgoessling, a psychologist who reviewed Jells and submitted a post-conviction affidavit, both concluded that this abusive home environment had a profound impact on Jells's psychological development and lead to feelings of victimization that added to the frustrations he experienced in school.

(c)  *Conclusion Regarding Prejudice Prong*

In light of the significantly greater detail about Jells's psychological background provided by the evidence that Jells's attorneys would have discovered if they had conducted a timely and complete mitigation investigation, there is a reasonable probability that at least one of the judges may have reached a different conclusion regarding the imposition of the death penalty. As opposed to the evidence presented at the hearing, the additional evidence shows that Jells experienced significant learning disabilities which caused him great frustration and led to increasingly aggressive behavioral responses. This additional evidence further demonstrates that Jells experienced a profound sense of victimization due to his mother's abusive relationships. In short, rather than being cumulative, this evidence provides a more nuanced understanding of Jells's psychological background and presents a more sympathetic picture of Jells.

This Court's recent decision in *Morales* confirms that Jells has made the required showing of prejudice. There, "the available information that Morales's trial counsel failed to discover and present to the jury included many specific details about his tumultuous life, continued and uncontrolled alcohol and drug abuse, dysfunctional family history, potential mental health problems, and detailed cultural background. In light of the volume and compelling nature of this evidence, there is a reasonable probability that effective counsel could have achieved a different outcome." *Morales*, 507 F.3d at 935 (quotation and citations omitted). *See also Dickerson v. Bagley*, 453 F.3d 690, 698-99 (6th Cir. 2006) (holding that petitioner satisfied the prejudice requirement by showing that his counsel failed to discover evidence that he was nearly mentally retarded, did not have an active biological father, and grew up in an unstable environment surrounded by "pimps, prostitutes, and drug dealers"); *Hamblin*, 354 F.3d at 489-93 (holding that a petitioner satisfied the prejudice requirement by showing that his trial counsel neglected to discover that he "grew up in extreme poverty and neglect, surrounded by family violence and instability, had a poor education and likely suffers from mental disability or disorder").

The undiscovered and omitted evidence detailed above could have shifted the balance between aggravating circumstances and mitigating evidence for at least one judge on the panel, leading him to find that a sentence of life rather than death was appropriate. *See State v. Ruppert*, 375 N.E.2d 1250, 1254 (Ohio 1978) (noting that Ohio Rev. Code Ann. §2929.03(E), now codified at § 2929.03(D)(3), required unanimity of the panel of three judges in imposing the death sentence).

That is all that is required for a showing of prejudice in a capital case during habeas review, and for the reasons above Jells has made this showing. *See Strickland*, 466 U.S. at 494; *Wiggins*, 539 U.S. at 535.

## V. WITHHOLDING OF INFORMATION IN VIOLATION OF *BRADY*

### A. Legal Standard

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was done in good or bad faith. To assert a successful *Brady* claim, a habeas petitioner must show that (1) the withheld evidence was favorable to the petitioner, (2) the evidence was suppressed by the government, and (3) the petitioner suffered prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The *Brady* rule encompasses both exculpatory and impeachment evidence when such evidence is material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). This Court explained in *United States v. Bencs* that "[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." 28 F.3d 555, 560 (6th Cir. 1994) (citing *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976)). Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial. *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). When determining whether the withheld information was material and therefore prejudicial, we consider it in light of the evidence available for trial that supports the petitioner's conviction. *See Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).

### B. Procedural Concerns

It is undisputed that the prosecution withheld from Jells during his trial the thirteen items of evidence that Jells presents in his petition. In fact, the City failed to provide much of this information despite Jells's filing of a Freedom of Information Act request. In response to the City's failure to disclose fully the requested information, the trial court granted Jells's mandamus action to compel production and both the Ohio Court of Appeals and the Ohio Supreme Court affirmed. *See State ex rel. Jells v. City of Cleveland*, No. 62678, 1992 WL 369893 (Ohio Ct. App. Dec. 3, 1992); *State ex rel. Jells v. City of Cleveland*, 619 N.E.2d 686 (Ohio 1993). The City of Cleveland finally provided the remaining withheld documents in April 1994, and, with a complete record available to him, Jells was able to file an amended petition for post-conviction relief.

Ohio provides two avenues for state prisoners to present newly discovered evidence that challenges their convictions. First, an Ohio prisoner can present newly available evidence in a petition for post-conviction relief under Ohio Rev. Code § 2953.21(A). If this evidence is not presented in the first petition, new grounds for relief presented in subsequent petitions generally are considered to be waived unless the prisoner can show that he could not have discovered the evidence prior to the first petition or that there is new law that should be considered. Ohio Rev. Code §§ 2953.21(A)(1)(a) and (A)(4). In the latter case, the petitioner must also show by "clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted. . . ." Ohio Rev. Code § 2953.23(A)(1)(b).

In Jells's case, he obtained the withheld information by April 1994. Jells had possession of this material prior to the filing of his Amended Petition to Vacate or Set Aside Sentence pursuant

to Ohio Rev. Code § 2953.21 on April 26, 1995.[6]　Thus, under Ohio law, *res judicata* bars Jells from raising those claims that were not presented in this Amended Petition because they could have been raised at that time. *State ex rel. Rash v. Jackson*, 807 N.E.2d 344, 346 (Ohio 2004); *Broom*, 441 F.3d at 400.

Second, Ohio also provides an avenue by which state prisoners can present newly discovered evidence to the trial court. Ohio R. Crim. P. 33(A). Jells could have petitioned the trial court for permission to file a Rule 33 motion in light of the fact that he was unavoidably prevented from obtaining the evidence prior to trial. Ohio R. Crim. P. 33(B). Jells did not petition for such permission, and at this point the state courts presumably would deny requests for relief pursuant to Ohio R. Crim. P. 33(A) because Jells has waited an excessive period of time since he obtained the evidence before seeking to raise it. *See State v. Newell*, No. 84525, 2004 WL 2931000, at *3 (Ohio App. Dec. 16, 2004) (unpublished opinion).

Therefore, as Jells has no state court remedies remaining, he procedurally defaulted those portions of this claim that were not presented to the Ohio courts. *See Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003); *see also Lancaster v. Adams*, 324 F.3d 423, 436 (6th Cir. 2003) (when a habeas petitioner fails to obtain consideration of a claim by the state courts, the issue is procedurally defaulted). Further, Jells is not able to demonstrate cause for not filing for relief under Ohio Rev. Code § 2953.23(A) or Ohio R. Crim. P. 33(A) after obtaining the withheld information. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Lancaster*, 324 F.3d at 437.

Because Jells has procedurally defaulted on those items not presented in his amended petition for post-conviction relief in the State of Ohio, we need only consider those items that were preserved. We conclude that the four items presented in Jells's *Brady* claim in his Amended Petition for Post-Conviction relief are preserved. In his Twenty-Seventh Cause of Action in that petition, Jells requested general relief for due process violations that occurred during his trial and specific relief for the *Brady* violations. Jells's legal argument in this Cause of Action, in full, states:

> Petitioner Jells' right to due process was violated because the States withheld material impeachment and exculpatory evidence from him during his 1987 capital trial.

> Petitioner's trial counsel filed a pretrial request for discovery. [ ] Pursuant to the due process clause of the Fourteenth Amendment, the prosecutor had a duty to disclose all material exculpatory and impeachment evidence in accordance with Petitioner's request for discovery. *See Brady v. Maryland*, 373 U.S. 83 (1963). *See also* Ohio R. Crim. P. 16.

In addition, Jells's petition explicitly references the withheld documents that are before this Court in this cause of action and states that the documents were not provided to counsel until well after the trial had ended:

> Petitioner made a public records request on post-conviction. Exhibit AAA [which includes requests for the disputed *Brady* documents]. Only then did the State fulfill its constitutional duty to provide material impeachment and exculpatory evidence. *See Brady*, 373 U.S. 83. During post-conviction, Petitioner obtained documents that

---

[6]The dissent notes that Jells failed to include a request for *Brady* relief in his initial petition for post-conviction relief. See Dissenting Op. at 32. This is irrelevant, as the Ohio courts granted Jells' motion to amend his petition, and it is this amended petition that was before the Ohio Court of Appeals and the Supreme Court of Ohio when they conducted their review of his claim.

should have been provided at the time of Petitioner's discovery request. *See* Exhibit CCC, Exhibit AAA, Series 1-25 [which includes the disputed *Brady* documents].

Four of the withheld items presented in this cause of action are included in the attached exhibits. Because these items were included in his claim for *Brady* relief that was presented to the Ohio Court of Appeals, these withheld documents have not been procedurally defaulted.[7]

Jells includes two more pieces of withheld information that were referenced in his Amended Petition for Post-Conviction Relief. However, these items were not presented as part of his *Brady* claim at that time, and were instead presented as part of a sufficiency-of-the-evidence claim. These claims were defaulted because they cannot be considered to have been fairly presented. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*, 404 U.S. 270, 275 (1971). To present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support. *Picard*, 404 U.S. at 277-78; *Whiting v. Burt*, 395 F.3d 602, 612-13 (6th Cir. 2005). Here, the state courts would not have been alerted that the alleged information supported his *Brady* claim through Jells's presentation of the information in the sufficiency-of-the-evidence context.

## C. Analysis

### 1. *The Withheld Information*

The four withheld documents that were included as a part of Jells's *Brady* claim in his Amended Petition for Post-Conviction Relief include: (1) A statement by Willie Smith, a long-time friend of Stapleton, in which he says that Stapleton visited him for a while on the night of the murder, that Stapleton had a drink while there and appeared "tipsy" when she left, that she said Devon was out in the van, and that he thought that Stapleton would get into a car with a stranger because she was very friendly. Smith stated that when he walked Stapleton to the door, he saw the van and could see Devon sitting in the van but could not see who was driving. Smith explained that he saw the same van days later, recorded the license number and reported it to the police, but that he had not received any response. Smith also selected the van from a photographic array that the officers presented to him; (2) A signed statement from Stapleton's sister, which averred that Stapleton would not take a ride from a stranger and that Stapleton had been drinking when she last saw her at 6:30 p.m. on the night of the murder; (3) An interview and statement from the victim's boyfriend, Anthony Massingill, indicating that he was certain that Stapelton had arrived at the bar to visit him at 11:00 p.m. "or a little after," that her stated purpose was to retrieve the keys to the apartment, and that during her visit, she appeared to have been drinking and "was high." Stapleton told him that she "was with a friend" who would give her a ride home; and (4) A police report noting that an anonymous person, later determined to be Camilla Banks, called twice within a thirty-minute

---

[7]The dissent argues that Jells's presentation in his Amended Petition resulted in fairly apprising the Ohio courts only that he was making a general due process claim. However, Jells explicitly references *Brady*, the prosecution's failure to disclose information until well after the trial had ended, and the documents that Jells believed should have been disclosed. This is sufficient to protect his *Brady* claim from procedural default.

No other court has concluded that this material is procedurally defaulted, and no party argues as much before this court. The parties seem to recognize, as the dissent chooses not to, that the record establishes that Jells has adequately preserved his *Brady* argument. In addition to Jells's explicit reference to the withheld information in his petition, there can be no doubt that the Ohio courts were aware that this material existed. The Ohio courts actively intervened on Jells's behalf regarding this material, granting or affirming a court order that compelled production of the material. At the federal level, the Honorable John M. Manos of the Northern District of Ohio conducted an evidentiary hearing on the issue of withheld *Brady* information, concluding that the record should be expanded to include *even more* withheld information. While we conclude that any withheld information not presented to the state courts has been procedurally defaulted, we reference this hearing simply to reiterate that the nature of this disputed withheld information has always been fairly presented and apparent in Jells's petitions for post-conviction relief.

period to state that she and her father observed a man grabbing a female and young boy at approximately 11:00 p.m, and that she could not see the male well but that her father could. The caller reported that the license plate number was 941 MJV, although she stated that she was not sure of the first three numbers.

### 2. *Ohio Court of Appeals Decision*

The Ohio Court of Appeals misconstrued Jells's *Brady* claim, stating simply that Jells's assignment of error was based on his contention that "the trial court erred in rejecting his claim that evidence for impeachment of the state's witnesses had to be provided prior to trial, . . . and not following the testimony of the witness on direct examination." 1998 WL 21375, at * 10. However, as we have noted, Jells's petition for post-conviction relief properly stated a *Brady* claim, included a clear statement that Jells was not able to receive the complained of information until post-conviction, and explicitly stated that the withheld information was attached to the petition. Because Jells fairly presented this claim to the state courts, Jells has preserved this claim. Further, as there is no state court decision regarding the merits of the claim, we review the claim de novo. *See Anderson*, 460 F.3d at 804.

### 3. *Application of* Brady

At trial, the prosecution sought to demonstrate that Jells had randomly kidnapped Stapelton from the streets of Cleveland.[8] The prosecution supported this theory by presenting witnesses at trial who testified that they saw Jells grab Stapelton from a street intersection and force her and Devon into his van sometime between 10:30 p.m. and 11:00 p.m, while Stapelton struggled and screamed.

Instead, the withheld statement by Massingill, if credited, demonstrates that Stapelton was still voluntarily getting into and out of the van *after* the time of the altercation at the street intersection, as he was "certain" that Stapelton visited him at 11:00 p.m. "or a little after." This statement obviously weakens any conclusion that the kidnapping occurred when Stapelton was forced into the van at the intersection, because it demonstrates that Stapelton was still voluntarily getting into and out of the van *after* the time of that incident. The withheld statements by Massingill and Smith also refute the prosecution's theory of a random kidnapping, as the statements support a conclusion that Stapelton had been voluntarily riding with Jells the night of the murder—and was freely getting in and out of the van—both before and after the time of the incident at the intersection.

Other withheld evidence impeaches the credibility of a witness who believed that the altercation was an abduction. At trial, Camilla Banks testified that she and her father witnessed Stapelton's abduction, and she positively identified Jells as the abductor. However, a withheld document reveals that an anonymous caller, later identified as Camilla Banks, told police that she had witnessed the incident but that "she couldn't see the male well."

---

[8]The State disputes that its theory at trial was that Jells had participated in a random kidnapping and murder. However, the prosecutor, Carmen Marino, detailed in his deposition the State's theory of the case:

> A. There was no ransom note, there wasn't a kidnapping for hire by some third party. It was a street assault on a woman for sex and she resisted. . . .
> Q. So the State's theory was that this was about a man who the State alleged to be Reginald Jells who had kidnapped some woman off the street for the purpose of some improper purpose, is that correct?
> A. Right.

The Ohio Supreme Court also seems to have credited this theory, stating that Jells "killed Ruby Stapleton after first kidnapping her and her child *off the streets* of Cleveland Ohio." *Jells*, 559 N.E. 2d at 477.

Second, not all of the testifying witnesses believed that Jells was abducting Stapelton when he forced her into the car. The impeachment of Camilla Banks combined with the information from Smith and Massingill that Stapelton voluntarily accompanied the driver of the van much of the evening would have bolstered the credibility of Wright, a trained security guard who was working in the area when he witnessed the incident at the intersection. At trial, Wright testified that he did not notify the police because, based upon his observations, he thought Stapelton and the man knew each other. Wright reasoned that the incident was something like a "lover's quarrel" and "nothing serious." Wright further testified that while he heard the lady yell three times, she never yelled for anyone to help her, even though there were a few people around at the time. Wright testified that Stapelton was placed into the van on the driver's side by the man, but that the door was not closed. Wright was uncertain how the victim moved over to the passenger side, but he observed her thereafter sitting straight up in the passenger's seat "like a normal passenger" and she had stopped yelling. At the time of the trial, Wright's testimony was in conflict with that of Owen and Camilla Banks, and the judges apparently found their testimony more credible. However, this balance could have shifted had Wright's testimony been presented along with the information indicating that Stapelton was with Jells of her own volition earlier in the night, that Camilla Banks did not clearly see Jells on the night in question, that Stapelton's boyfriend saw Stapelton around the time of or after the altercation, and that Stapelton was not under duress at that time.

Finally, the evidence that Stapelton was intoxicated on the night of her murder undercuts the aggravating factors listed by the three-judge panel when it found it appropriate to impose the death penalty. Specifically, the court listed as an aggravating factor the "methodical manner in which the defendant deprived the victim of her freedom," referencing Jells's statement to Owen Banks that Stapelton was drunk and implying that the court did not believe Jells's statement to be true. The withheld information indicates that the victim had been drinking and "was high," providing a plausible non-methodical explanation for the statement made to Owen Banks.

Lastly, at trial, Jells's defense included a theory that there had been no kidnapping.[9] Taken together, the withheld evidence is sufficient to undermine confidence in the trial court's rejection of this theory. The "kidnapping" and the circumstances surrounding the "kidnapping" were weighed by the trial court when they determined that the aggravating factors outweighed the mitigating factors in sentencing Jells to death. Because of this, the withheld evidence that weakens the strength of the State's kidnapping case is material for the purpose of *Brady,* as there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. Under Ohio Revised Code § 2905.01, kidnapping requires more than just "restraining" someone. Instead, any restraining must be done for a specific purpose, such as "to terrorize, or to inflict serious physical harm on the victim or another." O.R.C. § 2905.01. The withheld information suggests that Stapelton was voluntarily with Jells for much of the night, weakening an inference that any "restraint" of liberty at the intersection was done for the "purpose" of causing Stapelton harm. The withheld "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

---

[9]The dissent argues that Jells presented only a theory of misidentification at trial. Dissenting Op. at 31, n.2. However, the record shows that Jells's attorney argued that "there could be no kidnapping insofar as the parties had been riding around together for an hour to an hour and a half [following the alleged abduction.]" (Joint Appendix ("JA") 624-25.) In closing arguments, Jells's attorney argued that "the reason no one called the police [at the time of the altercation in the intersection] is because they all believed it was a lover's quarrel. . . . If it was, in fact a kidnapping, [Stapelton] had every opportunity to get out of the passenger side door. With the number of people standing around, if this was a kidnapping, you know she would say to someone, 'I'm being kidnapped. Help me . . . I suggest the reason is because she wasn't kidnapped." (JA 615-16.) Jells's attorney argued that the presence of Stapelton's footprint in the van was further evidence that no kidnapping occurred, as it indicated that she was "riding along in this van" and had put her feet "up on the dash," which was indicative of "being very comfortable with her surroundings." (JA 617.) Lastly, Jells's attorneys specifically "ask[ed] the Court to focus in on the kidnapping statute 2905.01 under which this defendant is charged, that the State has not met its burden as to the kidnapping." (JA 624.)

*Kyles v. Whitley*, 514 U.S. 419, 435 (1995).[10] "[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Id.* at 453. Here, there can be no confidence that all three judges would have determined that the aggravating factors listed in Ohio Rev. Code §2929.04(B) outweighed the mitigating factors had they been presented with the withheld information, and therefore there can be no confidence that the sentence would have been the same. *See Kyles*, 514 U.S. at 453.

The dissent cites the Ohio Court of Appeals' decision on direct appeal as support for her determination that there was overwhelming evidence of the aggravated circumstance of kidnapping at trial. Dissenting Op. at 30. However, this determination was made without consideration of the information withheld by the prosecution in violation of *Brady*. Further, in that court's findings as quoted by the dissent, each of the references to kidnapping are either ambiguous or directly impacted by the information withheld in violation of *Brady*. First is the summary of Devon's testimony that "he and his mother were either forced into [Jells]' van by [Jells] *or that they entered it voluntarily.*" Dissenting Op. at 28 (quoting from *Jells*, 1989 WL 43401 *2) (emphasis added). Next are the statements by the same court that there was an "abduction witnessed by Owen and Camilla Banks and Edward Wright," *id.*, and that five witnesses testified that the abduction was "intentional" or "deliberate and forceful." *Id.* These conclusions discount Wright's trial testimony that the dispute appeared to be a "lover's quarrel"—i.e. not an abduction—and credit Camilla's statement at trial that she could clearly see the abduction. However, the withheld statement by Stapelton's boyfriend, if believed, means that whatever happened at the intersection, Stapelton was not abducted because she was still voluntarily getting into and out of the van *after* the time of the alleged abduction. Further, the withheld call-log from the night of Stapelton's murder directly impeaches Camilla's statement regarding her view of the alleged abduction. Lastly, the withheld statements of Massingill and Smith bolster Wright's testimony at trial—completely ignored in the Ohio Court of Appeals decision—that no abduction occurred, given that evidence demonstrating that Jells and Stapelton knew each other would have bolstered his conclusion that the incident was "nothing serious" and like a "lover's quarrel."

The remainder of the dissent's challenge to the effect of the *Brady* violation goes to whether the evidence of Stapelton's murder was undermined by the violation. However, because Jells was charged with felony murder based upon a kidnapping, we need not, and do not, find that the trial court might have reached a different conclusion as to Jells's culpability as to the murder of Stapelton. Instead, it is sufficient for us to find, as we do, that the withheld *Brady* information refutes the prosecution's weak presentation of evidence regarding whether a kidnapping occurred.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL PRIOR TO THE PENALTY PHASE

### A. State Court Decision

On collateral review, the Ohio Court of Appeals rejected Jells's claim that he was denied effective assistance of counsel prior to and during his trial:

> Petitioner asserts that his counsel informed him that a three judge panel would be best for him because of the pretrial publicity surrounding Stapelton's death and because of Devon's testimony. He further asserts that his counsel never

---

[10] Jells also argues that the *Brady* evidence demonstrates that he is actually innocent of the aggravating circumstance of kidnapping. In order to demonstrate actual innocence, Jells must show that, more likely than not, a reasonable juror would not have found him guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Jells's new evidence does not rise to the standard of establishing his actual innocence because a reasonable juror still could have found him guilty even after considering this new evidence.

informed him that, inter alia, the three judge panel would also hear the mitigation phase, that if the matter were tried to a jury, all twelve members of the jury would have to agree to convict and sentence him, that a reviewing court would apply a presumption of correctness when reviewing certain errors. He avers, however, that his attorneys "felt that a three judge panel would be best in my case because they felt that a three judge panel would not give me a sentence of death." Amended Petition for Post-Conviction Relief, Exhibit S.

We find that this decision was a strategic choice. Accord *State v. Woods* (March 5, 1997), Medina App. No. 2589-M, unreported. Moreover, the court examined a similar argument in *State v. Sowell* (1991), 73 Ohio App.3d 672, 683, 598 N.E.2d 136, and stated:

> In his twenty-ninth cause of action, the only cause of action not heretofore addressed, Sowell challenges the knowing and intelligent nature of his waiver of a jury trial. Sowell offered in support of this contention his own affidavit, in which he averred that he executed the waiver upon trial counsel's representation that a trial before a three-judge panel would not result in the imposition of the death penalty. Sowell's "self-serving" affidavit is not, however, sufficient to rebut the record before us, which contains Sowell's written waiver in which he stated that he "knowingly, intelligently and voluntarily waive[d] and relinquish[ed] his right to a trial by Jury ***." See *Jackson*, supra. Sowell was, therefore, not entitled to an evidentiary hearing on the challenge advanced in his twenty-ninth cause of action when he failed to sustain his initial burden of demonstrating substantive grounds for relief.

See *State v. Kapper* (1983), 5 Ohio St.3d 36, 448 N.E.2d 823. Upon our determination that Sowell's petition was subject to dismissal without an evidentiary hearing, we overrule the first assignment of error.

In any event, petitioner has not demonstrated how this decision resulted in prejudice to him. He does not show, and we cannot say, that had this case been tried to a jury, the result would have been different. Accord *State v. Woods*, supra.

*Jells*, 1998 WL 213175, at *3.

While Jells argued before the state courts that his counsel made several errors prior to and during trial that constituted ineffective assistance of counsel, this Court granted a certificate of appealability only as to whether Jells was denied the right to effective assistance of counsel in making his decision to waive his right to a jury trial. On this issue, Jells argues that his counsel were ineffective because they failed to advise him properly of the consequences of his waiver. He argues that counsel failed to determine and inform the trial court that Jells was borderline mentally retarded, and that they did not fully advise Jells of his right to present to twelve jurors or any other jury-related implications. Jells additionally argues that his counsel were ineffective when they allowed him to sign the waiver prior to the completion of the Competency Report, which subsequently indicated that Jells understood his possible sentence to be at most one of life.

## B. Analysis

As explained above, this Court makes a two-part inquiry when reviewing ineffective assistance of counsel claims. *See, e.g.*, *Strickland*, 466 U.S. at 687. First, Jells must demonstrate that his counsel's performance was deficient. *Id.* Second, Jells must demonstrate that any such

deficiency caused him prejudice. *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* Further, because the state courts reached the merits of this issue, AEDPA review applies to this claim.

### 1. *Deficient Performance*

Jells correctly notes that his counsel had a professional duty to inform him of the nature of his right to a jury trial and the consequences of waiving it so that he could make an intelligent and informed waiver decision. *See* MODEL RULES OF PROF'L CONDUCT R. 1.4(b) (1983). However, Jells has not presented sufficient evidence to demonstrate that counsel failed in this duty.

In *United States v. Martin*, the Court explained what level of knowledge of the jury trial right is required for a defendant to intelligently waive it:

> A defendant, therefore, should have both the mental ability and some knowledge of the jury trial right before he is allowed to waive it. A technical knowledge of the jury trial right, however, is not what is required. A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right.

704 F.2d 267, 273 (6th Cir. 1983) (citations omitted); *accord Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004); *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002). The Court has explained that, while "[k]nowledge of these essential attributes is generally sufficient to enable a defendant to make a knowing and intelligent decision," *Martin*, 704 F.2d at 273, a defendant's knowledge of these elements is not "constitutionally required." *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990). Rather, the dispositive inquiry is whether the defendant "'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.'" *Sowell*, 372 F.3d at 836 (quoting *Sammons*, 918 F.2d at 597).

Despite Jells's broad allegations, he has not produced any evidence to establish that counsel failed to inform him of the fundamental nature of the choice confronting him. While Jells's affidavit indicates that he "does not recall" having been informed of the rights that go along with the right to a jury trial, the affidavit also indicates that he met with two of his attorneys to discuss whether the case should be tried to a jury or a three-judge panel. Jells further recalls that the attorneys told him that, in their opinion, a three-judge panel would be best because of the publicity surrounding the case, the potentially damaging testimony by Devon, and because they felt that a three-judge panel would not give Jells a sentence of death. Jells also submits the affidavit of one of his attorneys at the time, David Doughton, in support of his claim. However, this affidavit simply indicates that Doughten was not personally aware of whether Jells was informed of certain aspects of his right to a jury trial because he was out of town when the waiver was entered. Further, the affidavit confirms that the attorneys discussed with Jells which evidence would be presented to that particular three-judge panel and why the counsel thought it would be effective given that particular panel.

The submitted affidavits show that Jells was advised that a three-judge panel would likely be a better decision-maker for both phases of his trial. Providing such advice does not constitute unreasonable performance by counsel. *See Dickerson*, 453 F.3d at 700 ("Counsel necessarily had to make a choice between the two modes of trial, and it was impossible to say at the time which would be better for his client. We find no professional norms that dictate how a lawyer and his

client should go about making this choice."). Accordingly, Jells has not presented sufficient evidence to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### 2. *Prejudice*

Even if Jells could show that his counsel's performance was deficient, he would still need to demonstrate that he suffered prejudice as a result. To demonstrate prejudice, Jells "must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Jells has not made such a showing. Jells merely argues that if counsel had adequately informed him of his right to a jury trial, he might not have waived the right and at least one member of the jury might not have sentenced him to death. Jells provides no evidence to support this claim, and thus fails to demonstrate prejudice under *Strickland*.

## VII. KNOWING AND INTELLIGENT WAIVER

Jells did not present this claim to the Ohio Court of Appeals, and the Ohio Supreme Court reviewed the claim for plain error and concluded that no error occurred. *Jells*, 559 N.E.2d at 467-68. The court's plain-error review is not considered a review on the merits, and therefore Jells has procedurally defaulted on this claim if no exception is applicable. *See Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1881 (2007); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006).

Jells acknowledges that this claim was not presented to the Ohio Court of Appeals. He argues that, because his counsel had advised him to waive the right to the jury trial, there is no procedural bar as a result of his failure to question this waiver while he still retained the same counsel. In support of this argument, Jells relies on decisions addressing ineffective-assistance-of-counsel claims. These cases conclude that, in Ohio, "it is the well-settled rule that a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck*, 50 N.E.2d 145, 146 (Ohio 1943); *State ex rel. Johnson v. Ohio Adult Parole Auth.*,768 N.E.2d 1176 (Ohio 2002). Jells argues that at the time of his appeal, this rule would have barred any claim that the waiver was not valid because the same trial counsel represented him at trial and on appeal, that this counsel invited or induced the error, and that he therefore could not raise an objection. Jells argues that the Ohio Supreme Court would not treat any such omitted claim as procedurally barred, but would instead allow the claim to be presented at such time where the conflict was no longer present. Jells provides no support for his assertion. The cases he cites refer only to ineffective-assistance-of-counsel claims, and a similar exception to the procedural bar has never been applied by the Ohio courts in this situation. Therefore, we conclude that the Ohio court did not erroneously apply its default rule.

Further, Jells fails in his attempt at showing cause. He argues that the same counsel who obtained the waiver were counsel on appeal, and that for this reason he could not have been expected to raise the claim earlier. However, the ineffective-assistance-of-counsel claim regarding the jury waiver also involved the same counsel both at trial and on appeal, and Jells nevertheless raised that claim on appeal. Because he was able to bring the ineffective-assistance claim on appeal, he has not demonstrated any cause for why he could not also bring the ineffective-waiver claim at that time. Jells likewise has not made any showing that a fundamental miscarriage of justice occurred by the trial court's acceptance of his jury trial waiver, nor has he established that he is actually innocent as required by *Schlup*, 513 U.S. 298. We conclude that Jells has defaulted on this claim.

## VIII. PRETRIAL IDENTIFICATION

Jells complains that the line-up shown to Wright was unduly suggestive. At this line-up, there were five participants, and Jells was by far the youngest. Jells was placed in the middle of the line-up, dressed in an ill-fitting City of Cleveland jail jumpsuit made of gray or blue paper-like material and jail slippers or socks while the other participants wore street clothes and shoes. Jells's counsel filed a motion to suppress this identification before the trial court; the motion was denied without explanation.

### A. State Court Decision

On direct appeal, the Ohio Supreme Court addressed this claim on the merits and determined that the identification was properly admitted:

> Appellant in his fifth proposition of law alleges that the lineup shown to witness Edward Wright was unduly suggestive and inherently unreliable. Appellant bases this proposition on the fact that, while the other men in the lineup were wearing street clothes, appellant was wearing prison garb, i.e., a jumpsuit.
>
> In *State v. Sheardon* (1972), 31 Ohio St. 2d 20, 60 O.O. 2d 11, 285 N.E. 2d 335, paragraph two of the syllabus, this court held with respect to police lineups that:
>
>> "The due process clause of the Fifth and Fourteenth Amendments forbids any pre- or post-indictment lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. * * *"
>
> *See, also, Kirby v. Illinois* (1972), 406 U.S. 682. A reviewing court should examine the factors surrounding the actual eyewitness incident to determine whether the witness is susceptible to suggestion which would lead to an irreparable, mistaken identification. *See Neil v. Biggers, supra.*
>
> In the case sub judice Wright was able to describe the clothes that Devon and the victim wore. Wright was able to recognize that appellant's hair in court was shorter than it had been at the scene of the kidnapping. In applying the *Biggers* factors . . ., we find that Wright had ample opportunity to independently observe and identify appellant. Furthermore, he unequivocally displayed his ability to identify the defendant based on his recollection of the defendant's conduct. Accordingly, this proposition of law is not well-taken.

*Jells*, 559 N.E.2d at 472.

### B. Legal Standard

Pretrial identification procedures violate due process where the procedures are "unnecessarily suggestive and conducive" such that they risk "irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court held that identifications obtained through suggestive means may still be admissible if they are reliable. *Id.* at 196-97. In determining whether they are reliable, "the central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime,

the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.

*Id.* at 199-200.

## C. Analysis

Although it is clear that the pretrial identification procedure was unduly suggestive, the Ohio Supreme Court did not unreasonably determine that the identification was nonetheless reliable. The five factors to be weighed in determining reliability are: (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification. *Neil*, 409 U.S. at 199-200. We weigh these factors against the corrupting effect of the suggestive identification itself. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Despite the impermissibly suggestive procedure, Wright's identification of Jells was still sufficiently reliable. At trial, Wright testified that he was working as a security guard near the intersection where Jells allegedly abducted Stapleton. Wright heard a woman screaming and saw a man pick her up and throw her into the back of a van, and Wright testified that Jells was that man. During the incident, Wright was able to see Jells from 40 to 150 feet away, and he was focused closely on the event as it occurred.

Considering the evidence, the Ohio Supreme Court's determination that the identification was reliable was not unreasonable. Wright had a clear view of Jells during the incident, the area was generally well-lit, and Wright and Jells were as close as forty feet. Wright stated that he was closely focused on Jells and Stapleton as the incident occurred. At trial, he testified that Jells was wearing a black shirt with blue jeans, and was able to describe the appearance of his hair. Wright's prior physical descriptions of the perpetrator largely matched Jells. Wright demonstrated a high level of certainty in identifying Jells; indeed, he testified that he did not notice significant details about the other members of the line-up because he immediately recognized Jells as the perpetrator. Lastly, only eleven days elapsed between the incident and the line-up, which is not a significant period of time. *See Haliym v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) (concluding that a length of several days between observation and identification is not excessive); *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) (finding that three months is not an excessive length of time).

## IX. CONCLUSION

For the reasons above, we **REVERSE** the judgment of the district court but **GRANT** Jells a conditional writ of habeas corpus, vacating his death sentence unless the State of Ohio commences a new penalty-phase trail against him within 180 days from the date that this judgment becomes final, and **REMAND** the case for further proceedings consistent with this opinion.

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting. Today, a panel majority overturns an Ohio judgment, which sentenced petitioner Reginald Jells to death, by re-characterizing a defaulted *Brady* claim, reviewing it *de novo*, and finding that the State's withholding of evidence unconstitutionally prejudiced Jells; and also by finding that Jells's counsel were unconstitutionally inadequate because they failed to discover — and present to the trial court during the sentencing phase — mitigation evidence that would have provided a more "nuanced" and sympathetic picture of Jells. Because the record does not support either the majority's re-characterization of the *Brady* claim or the majority's finding of prejudice resulting from that claim; because the law does not permit us to overturn the state court's *Strickland* judgment on the basis of subjective interpretations of the facts, no matter how nuanced; and because the facts of this case do not permit a finding of prejudice on either the *Brady* claim or the *Strickland* claim, I must respectfully dissent.

## I.

When Devon Stapleton was four years old, he watched helplessly as a man beat his mother senseless with a transmission jack. So close was Devon to the onslaught that his mother's blood splattered onto him. His last image of his mother was of her lifeless body being dragged by this savage man into a cold, dark junkyard in the middle of the night. When he was found by Clyde Smith, alone outside a different junkyard in the wee hours of the morning, "Devon kept telling Smith that his mother was over a fence and that he could not get to her because of the wire." *Ohio v. Jells*, 1989 WL 43401, *2 (Ohio App. 1989). A police report from a few days after the crime recounts:

> Conversed with victim, Devon Stapleton. Devon was shown several photos of black males, and three photos of the suspect's van. Devon pointed immediately to the second photo which was the arrested male [Reginald Jells] and said, 'This is the man that hit my mommy,' 'Ask that man where is my mommy.' Devon also stated that [the picture of Jells's van] was the [assailant's] van. The child was adamant in positively identifying the photos of the suspect Reginald Jells and the [v]an, with the license plates 149MJV. *Devon requested of me to take* [*him*] *to see the man* [*Reginald Jells*] *so he could ask him where is his mother.* (Emphasis added.)

More to the point, Devon testified against Jells at trial. *See Jells*, 1989 WL 43401 at *2.

The Ohio Eighth District Court of Appeals' opinion from Jells's direct appeal of his conviction provides a reasonably vivid account of four-year-old Devon's testimony:

> Devon Stapleton took the stand and testified that on the night in question he and his mother were en route from his father's bar.[1] Devon stated that as he and his mother were trying to go to Coventry Road, [Jells] asked his mother if they wanted a ride. Devon's testimony indicated that he and his mother were either forced into [Jells]'s van by [Jells] or that they entered it voluntarily. At about 10:30 p.m.[,] Ruby Stapleton escaped from the van causing [Jells] to stop and physically force her and Devon back in. This is the abduction witnessed by Owen and Camilla Banks and Edward Wright. Devon testified that they drove around for a long time. Devon stated that he saw [Jells] hit his mother twice with a 'silver thing.' After his mother

---

[1]Devon's father is Anthony Massingill. *See* Maj. Op. § V(C).

was hit, Devon stated she 'got knocked out.'  Blood was splattered on Devon's clothes.

Devon testified that at some point [Jells] carried his mother from the van. Devon recalled seeing a junkyard and that [Jells] opened a big fence.  Devon could not see where [Jells] took his mother.  [Jells] returned to the van, drove around some more, and eventually stopped at a gas station.  Devon testified that he was later abandoned near a junkyard.  Devon stated that he just stood there until some man [Clyde Smith] picked him up.

Clyde Smith testified that in the early morning hours of April 19, 1987[,] he came upon a child who had been abandoned on the street.  Smith testified that the child was crying.  Smith picked up the child and took him to his (Smith's) home. Devon kept telling Smith that his mother was over a fence and that he could not get to her because of the wire.  Smith called the police.  Smith's wife, Anita, noticed a shiny substance on Devon's coat which she thought to be blood.  Devon stated that the blood was his mother's and that a man had thrown him out of a van.

*Jells*, 1989 WL 43401 at *2; *see also Ohio v. Jells*, 559 N.E.2d 464, 466-67 (Ohio 1990).  Elsewhere in the court of appeals' opinion, the court elaborated on its appraisal of Devon's testimony:

It is clear that Devon got a good view of the assailant.  Devon was in [Jells]'s van and able to observe [Jells] for an extended period.  He saw [Jells] hit his mother with a silver object and saw her blood splatter.  He saw [Jells] knock his mother unconscious, carry her into a junkyard and return to the van.  Devon stated he was eventually dropped off by [Jells].  Devon's ability to relay accurately these events indicated he paid a good deal of attention the night his mother and h[e] were kidnapped and his mother murdered.  Further, the information relayed by Devon was substantiated by scientific and physical evidence.  Devon described [Jells] as 'real big' and 'black black.'  Given the child's age and that he was able to recall the night's events in detail, we conclude that his description of [Jells] was not indeterminatively vague.  Further, Devon identified [Jells] with great certainty the day after [Jells]'s arrest.  We find nothing unreliable in Devon's out of court identification.

*Id*. at *6; *see also Jells*, 559 N.E.2d at 470.  The court acknowledged the corroborating evidence:

In this case four witnesses, Camilla Banks, Owen Banks, Edward Wright[,] and Devon Stapleton testified that the kidnapping was intentional and forceful.  All four identified [Jells] as the perpetrator.  Patricia Green's testimony also indicates that the abduction was deliberate and forceful.  Camilla and Owen Banks, Edward Wright[,] and Devon Stapleton all identified [Jells]'s van as the one used the night of the abduction.  Owen and Camilla Banks, Devon[,] and Wright identified the victim, Ruby Stapleton, as the woman [Jells] picked up and threw into the van.  It is clear from the evidence presented by the State that Ruby Stapleton was forced, against her will, into the van and that Devon was also placed into the van.

As discussed in the facts, the evidence showed that Ruby Stapleton while in the van was beaten with some sort of silver object and that she was 'knocked out' as a result and dragged into a junk yard.  The evidence further showed that Ruby Stapleton's blood was found in the van along with a shoe print which matched the left tennis shoe recovered on her body.  A transmission jack was also found in [Jells]'s van which matched the marks found on the victim's body.  [Jells]

> unequivocally stated that the van, which four witnesses had identified as belonging to the perpetrator of the kidnapping, belonged to him.

*Id*. at *8-9; *see also id*. at *18 ("This evidence overwhelmingly supported the trial court's finding that [Jells] was guilty of the aggravated circumstance of kidnapping."). A coroner testified that Ruby Stapleton was beaten to death with a blunt instrument, and the wounds — evidencing over 90 blows — matched a transmission jack recovered from Jells's van. *Id*. at *12; *Jells*, 559 N.E.2d at 467.

On appeal to the Ohio Supreme Court, that court affirmed the court of appeals decision, and concluded its opinion with an independent assessment of the death sentence, stating:

> [Jells] killed Ruby Stapleton after first kidnapping her and her child off the streets of Cleveland, Ohio. We find that the aggravating circumstance is proved beyond a reasonable doubt. [Jells] introduced in mitigation that [1] he had no significant history of prior criminal conduct, [2] he could possibly adapt well to imprisonment, [3] his youth (21 years old), and [4] his low intelligence. Weighing the mitigating factors against the aggravating circumstance, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

*Jells*, 559 N.E.2d at 477 (paragraph breaks omitted).

Based on the forgoing recitation of incontrovertible facts — which the majority has also expressly adopted as its own, Maj. Op. § I(A) — I cannot conclude that Reginald Jells suffered any undue prejudice from either the alleged *Brady* violation or the alleged ineffective assistance of counsel. Indeed, I find it remarkable that anyone could. Simply put, Devon's testimony is so powerful that, even standing alone, it proves that Jells kidnapped and murdered Ruby Stapleton:

> It is clear that Devon got a good view of the assailant. Devon was in [Jells]'s van and able to observe [Jells] for an extended period. He saw [Jells] hit his mother with a silver object and saw her blood splatter. He saw [Jells] knock his mother unconscious, carry her into a junkyard and return to the van. . . . Devon's ability to relay[] these events [accurately] indicated [that] he paid a good deal of attention the night his mother and h[e] were kidnapped and his mother murdered. Further, the information relayed by Devon was substantiated by scientific and physical evidence.

*Jells*, 1989 WL 43401 at *2; *see also Jells*, 559 N.E.2d at 470.

> The [physical] evidence [] showed that Ruby Stapleton's blood was found in the van along with a shoe print which matched the left tennis shoe recovered on her body. A transmission jack was also found in [Jells]'s van which matched the marks found on the victim's body. [Jells] unequivocally stated that the van . . . belonged to him.

*Id*. at *8-9. Jells was fully aware of Devon's testimony and this physical evidence before trial and yet he pursued a defense of misidentification — he argued that he was not the perpetrator, that he did not abduct Ruby and Devon Stapleton, and that he and his van had been misidentified. At sentencing, Jells argued "residual doubt" — i.e., the court should spare his life if it found (that is, because it *should find*) some residual doubt as to whether he actually committed the crime.

Even if the alleged *Brady* materials would have aided Jells's defense — which they would not, as they fit only an entirely different theory of defense; i.e., that Ruby was with Jells voluntarily[2] — Jells is still left with Devon's testimony, which is overwhelming.  And the currently alleged *Brady* materials do not diminish Devon's testimony in any way.  Furthermore, the after-acquired mitigation evidence (i.e., that Jells is learning disabled and socially maladjusted, and that, as a child, he was the victim of and witness to extensive physical abuse) does little to lessen Jells's culpability for this particular act, considering the totality of the evidence — i.e., Jells was sufficiently intelligent to become a successful auto mechanic, had no prior criminal history other than one purse snatching, and this was an especially gruesome murder, committed over the course of an entire evening, for purposes of sexual gratification, and in the presence of the victim's four-year-old son.

Therefore, even if the withheld evidence had been provided as the majority says it should have been and even if Jells's counsel had performed exactly as the majority says they should have, there is no legitimate possibility that the trial, the conviction, or the sentence would have been any different.  Jells kidnapped, assaulted, and brutally murdered Ruby Stapleton in front of her four-year-old son, and no rational finder of fact could reasonably consider the total evidence and conclude otherwise.  Consequently, I cannot join the majority's opinion and must respectfully dissent.

I also disagree with the majority's *legal analysis* of both the *Brady* claim and the sentencing-phase ineffective-assistance claim, and feel compelled to explain my disagreement, albeit briefly.  Even though I also disagree with the majority's analysis of Jells's other claims, I am not compelled to comment specifically on the majority's treatment of those claims because the majority ultimately reaches the correct conclusion — finding no merit to any of those other claims.

## II.

In analyzing Jells's *Brady* claim, the majority — conducting a *de novo* review — contends that if the State had properly provided the withheld evidence to Jells's counsel, then that counsel might reasonably have prevented the State from convincing all three members of the three-judge panel that Jells kidnapped Ruby Stapleton.  The majority says that, taken together, this evidence is sufficient to undermine confidence in the trial court's finding that a kidnapping occurred.  *See* Maj. Op. § V(C)(3).  The four pieces of evidence at issue are:  (1) a statement by one Willie Smith relating his impression of Ruby on the night of the murder; (2) a statement from Cynthia Yawn, Ruby's sister, relating her impressions of Ruby on the night of the murder; (3) a statement from Anthony Massingill, Devon's father, relating his impressions of Ruby on the night of the murder; and (4) a Crimestoppers intake sheet, attributable to Camilla Banks, stating that she had not gotten a good look at the perpetrator.  The majority surmises that if Jells's counsel had been armed with this evidence, then that counsel would have:  (1) been more persuasive in showing that Ruby was

---

[2]Jells's theory of defense was "misidentification" (i.e., someone else abducted and murdered Ruby Stapleton), and though he produced only one witness for his defense, that witness testified to Jells's alibi (that Jells was at home), which was consistent with the misidentification theory.  Of the *Brady* materials at issue, only the anonymous statement to Crimestoppers (which was later determined to have been Camilla Banks) would have furthered this defense, in that it would have cast doubt on Camilla Banks's ability to identify Jells, but even that would have had little force against her in-court identification.  The remaining evidence would actually have bolstered the identification of Jells.

Presumably, if Jells's counsel had received the withheld evidence before trial, counsel would have pursued a different theory of defense, namely, the one now endorsed by the majority:  that it *was* Jells, but that Ruby was with him voluntarily, and hence, had not been kidnapped.  But, even assuming that counsel could have discredited Camilla's testimony, diminished her father's testimony, and bolstered the favorable portions of Edward Wright's testimony, the prosecution still produced overwhelming evidence of Jells's guilt, most notably, Devon's testimony and the presence of Ruby's blood in Jells's van.  Furthermore, Patricia Green's testimony also indicated that the abduction was deliberate and forceful, and there was a stipulation at the beginning of trial, from which the prosecution agreed not to call all of the witnesses to the incident.  In a subsequent deposition, the prosecutor testified that "we had a ton of people that watched that kidnapping and I believe I told the defense that either they stipulate to it or I was going to call every one."

with Jells voluntarily "after the time of the altercation at the street intersection"; (2) been more effective in impeaching Camilla Banks's identification of Jells; (3) bolstered Edward Wright's testimony that Ruby appeared to be with Jells voluntarily and correspondingly impugned the contradictory testimony that Ruby appeared to have been abducted; and (4) nullified suspicion that Jells had been lying when he told Owen Banks that Ruby was drunk. Maj. Op. § V(C)(3).

As I have indicated, I am confident — particularly in light of Devon's testimony — that the absence of this allegedly withheld *Brady* evidence had so little effect on the determination that Jells kidnapped Ruby that Jells cannot show any prejudice, even if there was error. Thus, I disagree with the majority's contention that the allegedly withheld evidence undermines confidence in the trial court's finding that a kidnapping occurred. In fact, I find this contention inconceivable. But, the *Brady* issue itself — and the majority's treatment of it — warrants some further discussion.

Jells first filed a petition for post-conviction relief with the state trial court on November 8, 1991. He filed an amended petition on April 26, 1995. During the intervening four years, Jells had obtained copies of the witness statements to the police that comprise his *Brady* claim. Thus, Jells did not raise a *Brady* claim in his original (Nov. 8, 1991) petition, but added it as the 27th cause of action in his amended (Apr. 26, 1995) petition, claiming that his "right to due process was violated because the State withheld material impeachment and exculpatory evidence from him during his 1987 capital trial." Specifically, Jells complained that: (1) witness Edward Wright had mistakenly described Jells as having a light skin complexion and a chubby face; and (2) Devon Stapleton had mistakenly described Jells's van as white, Jells's murder weapon as brown, and Jells's jacket as light blue. Jells did not identify or describe any other *Brady* materials in that petition, and notably, those are not the *Brady* materials (or arguments) to which either Jells or the majority now points.[3]

The state trial court eventually ruled on (and dismissed) Jells's petition on April 9, 1997. In its opinion, the state trial court addressed Jells's *Brady* claim succinctly, stating: "Cause of Action 27: No exculpatory evidence was withheld from [Jells]. All witness statements were subject to in-camera inspection and disclosure to defense. Conflicting or disagreeing statements are matters for the trier of fact to resolve." The court concluded: "The evidence in the record established . . . that no exculpatory evidence was withheld from [Jells]. This court overrules Cause[] of Action . . . . 27." The court denied his petition and Jells appealed the denial to the state appellate court.

On appeal, Jells asserted that his *Brady* claim was based on the two aforementioned pieces of evidence — (1) the police reports suggesting that Edward Wright had mistakenly described Jells as having light skin and a chubby face, and (2) the report suggesting that Devon had mistakenly described the van as white, the murder weapon as brown, and Jells's jacket as light blue. Jells did not discuss, or even refer to, any other withheld materials. Furthermore, he framed the trial court's error as a misapplication of *Brady*, *not* as a misstatement of what had occurred at trial: "[The State] asserted, and the trial court agreed, that because the statements of these witnesses were all available for in-camera inspection by defense counsel, then no exculpatory evidence was withheld from [Jells]. This analysis is incorrect." So, Jells did not argue that the factual premise was incorrect — he did not argue that the witness statements had not been available for in-camera inspection by his defense counsel. Jells argued that "[t]his *analysis* is incorrect," and, specifically, that the court's in-camera inspection during trial was not enough, but that "[t]he prosecutor had a duty to disclose all

---

[3]Recall that the four *Brady* materials at issue here are statements from (1) Willie Smith, (2) Cynthia Yawn, and (3) Anthony Massingill; and (4) a Crimestoppers intake sheet, containing a statement attributable to Camilla Banks. The majority contends that Jells has preserved his *Brady* claims with respect to these four withheld items of information, *see* Maj. Op. § V(B)(1), based on Jells's attachment of these materials as exhibits to his state post-conviction petition, even though he did not argue about them, discuss them, or even mention them in the text of the petition.

material exculpatory and impeachment evidence in accordance with [Jells]'s request for discovery." That is, Jells argued that the State was obligated to disclose the witness statements *before trial*.[4]

In resolving his appeal, the Ohio court of appeals framed Jells's *Brady* claim as follows: "[Jells] claim[s] that evidence for impeachment of the state's witnesses had to be provided prior to trial, pursuant to *Brady*[], and not [in camera] following the testimony of the witness on direct examination." *Ohio v. Jells*, 1998 WL 213175, *10 (Ohio App. 1998). The court then rejected this claim, finding that: (1) the government's disclosure was sufficient under Ohio's discovery laws (i.e., "while [Jells] complains that the statements should have been provided prior to trial, we are satisfied that compliance with the procedure outlined in [Ohio] Crim. R. 16(B)(1)(g) is sufficient to meet the requirements of *Brady*"); and (2) there was no prejudice anyway (i.e., "Moreover, no evidence has been offered to indicate that there is a reasonable probability that an earlier disclosure of this information would have resulted in a different outcome of the proceedings.").

The majority rejects both the Ohio trial court's findings of fact and the Ohio appellate court's findings of law, and instead conducts a *de novo* review based on its assertion that the Ohio courts "misconstrued Jells's *Brady* claim," so "there is no state court decision regarding the merits of th[at] claim." Maj. Op. § V(C)(2). The majority contends: "Jells's petition for post-conviction relief properly stated the *Brady* claim [and] included a clear statement that Jells was not able to receive the complained of information until post-conviction." Maj. Op. § V(C)(2). But, this "complained of information" — i.e., the information described in Jells's post-conviction-relief motion and subsequent appellate brief — is not the information presently at issue. The only information for which there is "a clear statement" in either Jells's post-conviction-relief motion or ensuing appellate brief are the two witness statements (of Edward Wright and Devon Stapleton) suggesting that Wright had mistakenly described Jells as having light skin and a chubby face and Devon had mistakenly described the van as white, the murder weapon as brown, and Jells's jacket as light blue. The Ohio trial court decided this case on a purely factual basis and flatly rejected Jells's assertion that these documents had been withheld, stating unequivocally: "*All* witness statements were subject to in-camera inspection and disclosure to defense." (emphasis added).

Furthermore, when Jells appealed the denial of his post-conviction petition, he did not argue that the statements were not available to his defense counsel for in-camera inspection. He conceded that they were and argued (incorrectly) that *Brady* required pre-trial discovery. More importantly, Jells did not complain at all about the four documents now at issue. Those were not in dispute.

For all of these reasons, I disagree with the majority's contention that Jells preserved his *Brady* claim as to these four documents, and I disagree with the majority's statement that the Ohio court did not render a decision on the merits. But, even if Jells properly preserved his claim (by appending the documents), it is beyond dispute that prejudice is a substantive component of a *Brady* claim, *see Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (citing *Brady*, 373 U.S. at 87), and the Ohio court of appeals clearly rendered a finding that Jells suffered no prejudice. Therefore, I must also disagree that this decision does not warrant deference under AEDPA. Inasmuch as the Ohio court of appeals considered the question of prejudice, decided it, and relied upon its determination that Jells had shown none, I cannot conclude that it unreasonably applied *Brady* in this case.

---

[4] Which is — as the state court found — an inaccurate portrayal of the *Brady* doctrine. *See United States v. Presser*, 844 F.2d 1275, 1284 (6th Cir. 1988) ("The *Brady* doctrine did not create a constitutional right of pre-trial discovery in a criminal proceeding." (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977))); *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007) ("*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose. Delay violates *Brady* only when the delay itself causes prejudice.").

Moreover, the district court reconsidered this evidence in light of Jells's habeas petition and reached a similar conclusion, finding no violation and no prejudice. *See Jells v. Mitchell*, No. 98-CV-2453, *14-20 (N.D. Ohio Mar. 18, 2002). Specifically, the district court explained:

The evidence that the victim [Ruby Stapleton] and her son [Devon] were with [Jells] willingly earlier in the evening is not relevant. Indeed, [Jells's] defense counsel was aware of this fact and argued in his closing argument [in the state trial court] that the victim's conduct earlier in the evening refuted the kidnapping charges. Specifically, counsel argued that there could be no kidnapping insofar as the parties had been riding around together for an hour to an hour and a half. The circumstances, however, became a kidnapping when, at the intersection of Lakeview and Euclid, the victim and her son were forced into [Jells]'s van. As described in the Ohio Supreme Court's opinion, several witnesses (including the victim's son) described what happened at the intersection. *This testimony is sufficient to establish a kidnapping at that time regardless of what had occurred earlier in the evening*.

*Id*. at *16 (citation omitted; emphasis added). The district court also addressed the other materials:

The Crimestoppers intake statement is only a paragraph. Its vague statement of what Camilla [Banks] told Crimestoppers, regarding what the victim supposedly told her [Camilla's] father [Owen Banks], has virtually no impeachment value. If anything, the statement is highly incriminating [to Jells] because it contains that license plate number that subsequently was traced to [Jells].

Camilla's statement to the police that she could not see the male well is more significant. Such a statement arguably could have been used to impeach her description and identification of [Jells]. Its non-disclosure, however, does not warrant relief because the statement is not 'material' as that term is used in a *Brady* claim. It does not undermine the confidence in the result of the trial. The statement specifically indicates that although Camilla could not see the man well, her father could. Thus, even assuming Camilla's testimony could be impeached, Owen's testimony is bolstered by the statement. In addition, other witnesses were able to identify [Jells]. The statement, therefore, does not undermine confidence in the trial.

*Id*. at *18-19. Thus, the district court concluded its *Brady* analysis:

[This court] must view all the allegedly withheld evidence collectively to determine whether such evidence is 'material' in that it undermines the confidence in the outcome. Here, none of the evidence allegedly withheld can be characterized as exculpatory. In addition, only Camilla's pretrial statement that she could not see the male perpetrator clearly, even arguably would have been usable for impeachment. In view of the testimony of other eyewitnesses to the kidnapping, that statement lacks sufficient significance to be material as the term is defined in the *Brady* context.

*Id*. at *20. The district court, therefore, rejected Jells's *Brady* claim. *Id*.

Based on the foregoing, I cannot agree with the majority's rendition of the facts or application of the law in regard to this *Brady* issue. Consequently, I respectfully dissent.

### III.

In analyzing Jells's sentencing-phase ineffective-assistance claim, the majority acknowledges that "[t]he Ohio Court of Appeals correctly identified the *Strickland* standard as the governing

federal rule," but asserts "that the Ohio court applied this standard to the facts of Jells's case in an objectively unreasonable manner." Maj. Op. § IV(C). But, what the majority goes on to describe is not a misapplication of *Strickland* — let alone "an objectively unreasonable" misapplication — but rather, a perfect application of *Strickland*, albeit one in which the Ohio courts simply came to a subjective conclusion different from that of the majority regarding the persuasiveness, forcefulness, or weight of the after-acquired mitigating evidence. This is not a proper basis for habeas relief.

## A.

Jells raised his ineffective-assistance claim in his Ohio state petitions for post-conviction relief, "assert[ing] that his trial counsel were ineffective in failing to introduce evidence regarding his troubled family and early life and in failing to utilize expert assistance." *Ohio v. Jells*, 1998 WL 213175, *5-6 (Ohio. App. 1998). Following the trial court's denial of his petition, the Ohio court of appeals analyzed the claim under *Strickland*, *id*. at *2, and found no prejudice:

> In this matter, the mitigation presented at trial tended to focus upon [Jells]'s loving behavior to his family, his good behavior at school, his obedience to authority and his teachers, his strong work ethic, and his tendency to walk away from an argument. In addition, trial counsel indicated that [Jells]'s family had moved many times, and also presented expert opinion evidence that [Jells] was of borderline intelligence and over-controlled his hostility. Finally, [Jells] presented an unsworn statement in which he emphasized his work ethic, his empathy for Devon, his sadness at the tragic manner in which [Ruby] Stapleton must have met her death, and his disagreement with the verdict reached by the panel. Further, in its written opinion, the three judge panel observed that [Jells] had presented evidence of, *inter alia*, character, family relationships, employment history, and emotional stability.

> Examining the evidence now offered *dehors* the record, we find that a certain measure of the evidence which [Jells] now claims should have been admitted to be cumulative of what was presented at trial, i.e., the frequent moves, change of care givers, borderline intelligence, superficial personality style. *We are therefore unable to conclude that there is a reasonable probability that, but for this alleged omission of counsel, the result of his trial would have been different, and [Jells]'s challenge to the effectiveness of counsel in this respect fails*.

> As to the remaining items concerning the other more tragic circumstances which [Jells] now claims should have been admitted, i.e., his mother's alcoholism and the abuse which he often witnessed, this information would appear to be completely inconsistent with the favorable portrait of [Jells] which counsel presented at trial. That is, trial counsel emphasized the favorable aspects of [Jells]'s life and chose to present him as someone who over controlled his negative feelings and had no pathological difference or condition requiring treatment or thought disorder. Considered in light of the nature of [Jells]'s defense at trial, *we are compelled to conclude that the more negative information produced in connection with the amended petition for post-conviction relief is inconsistent with the essential trial strategy* of working to establish reasonable doubt and in turn residual doubt that [Jells] committed these offenses. *We are therefore unable to conclude that counsel was ineffective in failing to present this information*.

> . . .

> Indeed, social worker Linda Pudvan's averment that even negative family history is relevant to provide an explanation of Mr. Jells life and behavior during his

offense and attorney Ken Murray's averment that unfavorable information further serves to explain the stresses and traumatic events that culminated the night of the offense *seem odd in light of the complete denial presented at trial*.

*Id.* at *5-6 (citations, quotation marks, and editorial marks omitted; emphasis added). So, based on the foregoing, it appears that the Ohio court of appeals largely accepted Jells's assertion that his counsel's investigation was deficient and decided the case instead on the question of prejudice.

**B.**

The majority "conclude[s] that the Ohio court applied [*Strickland*] to the facts of Jells's case in an objectively unreasonable manner." Maj. Op. § IV(C). According to the majority, Jells's counsels' performance (i.e., their search for mitigating evidence) was deficient and prejudicial (i.e., there is a "reasonable probability" that the mitigating evidence that would have been found during a sufficient search would have persuaded the three-judge panel that Jells was not deserving of the death penalty). Thus, the majority reaches a different conclusion than the Ohio court reached, even though they both applied the same law (i.e., *Strickland*) and considered the same evidence.

But, more than that, the majority contends that the *reason* they reached different conclusions is not merely a disagreement on the weight or effect to be given to the evidence — that would be entirely unacceptable under AEDPA; it is because the Ohio court applied *Strickland* in a manner that was *objectively unreasonable*. Because the majority disagrees with the two different parts of the *Strickland* analysis in two different ways, the two disagreements require separate examinations.

**1.**

It is, at this point in time, beyond dispute that defense counsel in a capital case must perform a complete mitigation investigation. *See*, *e.g.*, *Hamblin v. Mitchell*, 354 F.3d 482, 496 (6th Cir. 2003) (Batchelder, J., dissenting). Nor is there any dispute that this requirement was "clearly established" as of Jells's sentencing in 1987. *Id.* Jells's counsel was deficient in this regard.

After ten pages of analysis, the majority concludes similarly, stating: "Jells has demonstrated that his counsel [performed deficiently] when they: (1) failed to timely prepare for the mitigation phase of Jells's trial; and (2) failed to use a mitigation specialist to gather information about Jells's background in preparation for mitigation." Maj. Op. § IV(C)(1)(e). This unremarkable proposition, however, leads immediately into the unsupported — and, indeed, unexpected — assertion that: "The Ohio Court of Appeal's *refusal to recognize* that these omissions by Jells's counsel fell outside the bounds of professionally competent assistance constituted an unreasonable application of federal law as determined by the Supreme Court in *Strickland*." Maj. Op. § IV(C)(1)(e) (emphasis added).

But, far from "refus[ing]" to find the performance deficient, the Ohio court of appeals tendered no finding whatsoever on the sufficiency/deficiency of counsel's performance and, in fact, appears to have assumed or accepted that the above-described performance *was deficient*. Because *Strickland*, 466 U.S. at 697, expressly provides for disposition solely on the prejudice prong, the Ohio court's application of *Strickland* in this manner cannot be deemed objectively unreasonable. In fact, it is not even incorrect. Nor is it even in disagreement with the majority's assessment.

**2.**

The Ohio court's opinion *does* disagree with the majority on the question of prejudice, however, and the majority begins by saying: "the Ohio Court of Appeals unreasonably determined that the alleged errors of Jells's trial counsel did not prejudice Jells's case." Maj. Op. § IV(C)(2). The Ohio court *did* indeed determine that Jells's counsel's alleged errors did not prejudice Jells's

case, but I cannot agree that this determination was unreasonable. More to the point, I cannot agree that the *manner* by which the Ohio court made this determination was unreasonable.

The Ohio court — just like the majority, *see* Maj. Op. § IV(C)(2) — "evaluate[d] the totality of the available mitigation evidence — both that adduced at trial[] and the evidence adduced in the [post-conviction-relief] proceeding [and] re-weigh[ed] it against the evidence in aggravation," *see Williams v. Taylor*, 529 U.S. 362, 397-398 (2000), to determine whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *see Strickland v. Washington*, 466 U.S. 668, 694 (1984). The Ohio court did not exclude, omit, or fail to consider any evidence — it fully considered all the same evidence as the majority did. The Ohio court did not consider itself bound by an unreasonable or improper standard of review — it fully and fairly considered all of the evidence, and re-weighed it against the aggravating evidence. In fact, there was nothing improper about the Ohio court's *application* of *Strickland*.

The majority's disagreement with the Ohio court is not in its *application*, but in its *conclusion*, and even that disagreement is not pronounced. The majority says that "this [after-acquired] evidence provides a more nuanced understanding of Jells's psychological background and thus presents a more sympathetic picture of Jells," Maj. Op. § IV(C)(2)(c), thereby leading to "a reasonable probability that at least one of the judges may have reached a different conclusion regarding the imposition of the death penalty," *id*. Even if this assessment were correct — which, in my view, it is not — these findings of "a more nuanced understanding" and "a more sympathetic picture" are purely (necessarily) *subjective* determinations. Our disagreement with a state court's subjective determination of the effect of the evidence is not a proper basis for habeas relief. *See*, *e.g.*, *Schriro v. Landrigan*, 550 U.S. --, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold."); *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (citations and quotation marks omitted)); *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("unreasonable application of federal law is different from an incorrect application of federal law").

The majority relies on *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007), and *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006), to support its position, but in both of those cases the state court had rendered no opinion on the prejudice prong, so our review was *de novo*. In the present case, the Ohio court did render an opinion on the prejudice prong — finding no prejudice — and our review is (supposed to be) the deferential review dictated by AEDPA. The majority also cites *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003), but that case was pre-AEDPA. Thus, the majority's proffered legal support for its approach to this case actually provides no support at all.

## IV.

For all of the foregoing reasons, I respectfully dissent from the majority's opinion in the present case. I would affirm the district court's decision to deny habeas relief.